**Henry Luis Sinohui CONTRERAS, Oscar Sinohui Contreras, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 17171.**

United States Court of Appeals Ninth Circuit.

April 19, 1961.

---

**64**

William F. Gavin, San Diego, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Thomas R. Sheridan, Los Angeles, Cal., Elmer Enstrom, Jr., Asst. U. S. Attys., San Diego, Cal., for appellee.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is a one count criminal prosecution for the smuggling of marijuana, as proscribed by 21 U.S.C.A. § 176a. The district court had jurisdiction under 18 U.S.C. § 3231. This court has jurisdiction over the appeal. 28 U.S.C. § 1291.

On August 17, 1959, appellants, Henry and Oscar Contreras, and their codefendants, were driving north on Highway 395. Near Temecula, California, about seventy-two miles north of the Mexican border, appellants were stopped by Weldon Potter, a Patrol Inspector employed by the Immigration and Naturalization Service. Potter was merely performing a routine check for "illegal aliens." He questioned the occupants of the car as to their place of birth. The person on the right side of the front seat did not give a clear answer to the question, and Inspector Potter became suspicious. He asked the driver to pull over to the side of the road; and he then continued his investigation. Potter continued to be suspicious of one of the passengers in the back seat who claimed to be a native of Puerto Rico. Potter then requested the driver to open the trunk and the driver complied with this request. An examination of the trunk revealed nothing of significance. Potter however, desired to pursue further the question of the Puerto Rican's citizenship. He asked the man on the right side of the front seat to step out so that he could converse with him. When this passenger complied with the request, Potter noted, for the first time, a paper sack, covered by a leather jacket and a bedspread. He looked into the sack and noted that it contained a vegetable substance. Not knowing what it was, but suspecting it to be marijuana, he asked the Puerto Rican to identify it. The Puerto Rican disclaimed knowledge. Potter then walked over to another inspector, James Brantly, and asked him about the contents of the sack. Brantly identified the substance as marijuana. The inspectors retained the sack of mari-

juana and arrested all of the occupants of the vehicle.

On the day set for trial defendants made a motion for the suppression of evidence. The motion was denied, after a hearing, at which Potter and Brantly, but not defendants, testified. The court held that it had not been shown that any of defendants' property had been seized. Defendants, therefore, did not have standing to object to the seizure of the property in question. At trial evidence of the search of the car and the seizure of the marijuana was received over objection by counsel. The jury found all defendants guilty; and appellants accordingly have brought this appeal.

The case thus presents only two questions:

1. Did appellants have standing to move for the suppression of evidence and to object to the introduction of the evidence?

2. Was the evidence obtained by an illegal search?

I. *Appellants' standing.*

■ When the trial court denied the motion to suppress, the case of Jones v. United States, 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, *had not yet been decided*. In light of that case, this court must reject the trial court's ruling that appellants had no standing to raise the search and seizure question. Where a criminal charge against a defendant is based upon possession, the Jones case establishes that the defendant, is, by that very fact, a "person aggrieved by an unlawful search and seizure," (Fed.R.Crim. P. 41(e), 18 U.S.C.A.) and may, therefore, raise the constitutional question. The Supreme Court in the Jones case stated further that the government should not be allowed to deprive a "defendant of standing to bring a motion to suppress by framing the indictment in general terms, while prosecuting for possession." Jones v. United States, supra, 362 U.S. at pages 264–265, 80 S.Ct. at page 733.

■ In the case at bar, appellants were prosecuted for violating 21 U.S.C.A.

§ 176a. The section contains a provision permitting a conviction based upon the defendant's unexplained possession of the contraband substance. The jury was so instructed, and, accordingly, could have convicted defendants upon such ground. The government's case, then, rested at least in part upon "possession," and consequently defendants had standing to question the legality of the search and seizure.

The government does not strongly urge this aspect of the case. Appellee merely asserts, correctly, but with little force or relevance here, that Jones did not "eliminate the requirement that appellants properly establish" themselves to be "persons aggrieved" under Federal Rules of Criminal Procedure 41(e).

Finding appellants did have standing to move for suppression of the evidence, not as the law was when the court below ruled on the motion, but as it was later determined to be by the Supreme Court, we then reach the second question:

II. *Was the search illegal?*

■ The search involved here was made without a warrant; and it was not made in connection with a lawful arrest, since the arrest admittedly was made after the search and seizure took place. Furthermore, we cannot believe that the search can be sustained as a border search. The search was not made at or near the border, but seventy-two miles north of it. There was here no history of suspicious behavior at the border followed by surveillance or pursuit. Cf. Murgia v. United States, 9 Cir., 1960, 285 F.2d 14.

Appellee, then, must attempt to justify the search on the ground that it was reasonable under the circumstances. In the final analysis, this means—did the immigration inspector have probable cause to conduct the search? Appellants contend that the Cervantes case (Cervantes v. United States, 9 Cir., 1960, 278 F.2d 350) is controlling here. We do not agree. In Cervantes it was held that the officer did not have adequate information to justify his stopping a car in order to

make a search for narcotics. In the instant case the officer was unquestionably justified in stopping the car, not, however, to search for narcotics, but to establish appellants' nationality. Did anything occur after the car was stopped, or was there anything inherent in the process of establishing appellants' nationality that gave the officer the right to make a search? Appellee contends that the inspector, in furtherance of his aim of establishing appellants' nationality, was justified in searching the car. Relying upon Haerr v. United States, 5 Cir., 1957, 240 F.2d 533, appellee asserts that the inspector had authority to make any investigation he thought proper to determine whether any of the car's occupants were aliens. In taking this position, he relies on the language: "Such a procedure might reasonably involve examination of any personal property in their possession as well as all parts of the car including the trunk." Haerr v. United States, supra at page 535. This broad assertion must, when the facts of the case are considered, be considered as dictum. The Haerr case did involve an immigration check at a station located about fourteen miles from the border. When the officers began their investigation, they noticed appellant in the back seat, *apparently attempting to hide two boxes*. When asked to pull over to the side, the driver rapidly and suddenly drove the car away. The officers pursued, and noticed that the boxes in question were thrown from the car a few hundred yards from the check station. There was thus *no search* nor any seizure at all. The court so held.

 The Haerr case, then, provides little guidance. The matter is not to be determined by any fixed formula, but by a proper assessment of the facts in each case, as the Supreme Court has repeatedly told us (United States v. Rabinowitz, 1950, 339 U.S. 56, 63, 70 S.Ct. 430, 94 L.Ed. 653). Under the circumstances, did Inspector Potter have probable cause to search the car and to examine the paper sack? We see no logical connection between the examination of the sack and the determination of appellants' citizenship, or the citizenship of any other occupant of the car. Potter testified that he might have found a document in the sack that would have helped him to make up his mind regarding the citizenship of the Puerto Rican. We are inclined to believe this was a consideration which must have occurred to Potter sometime after the events in question transpired.

If the search cannot be justified as a reasonable means of determining the citizenship status of the car's occupants, it cannot be justified in any other way under the rubric of "probable cause." Assuredly there is nothing suspicious about a paper sack lying under a bedspread and jacket on the front seat of a car located seventy-two miles north of the Mexican-American border.

Under the circumstances, there was no substantial reason for the officer to suspect that appellants were carrying contraband until the search in question was conducted. The only possible justification for the search is that it was a reasonable means of determining the citizenship status of the occupants of the car. Such a purported justification is unsound. See the opinion of this court in a somewhat similar case, Luis Sanchez Plazola v. United States, 1961, 291 F.2d 56.

The judgment of conviction is *reversed*, and the matter *remanded* to the court below with instructions to dismiss the indictment as to each of these appellants.

CHAMBERS, Circuit Judge (concurring).

Regretfully, I concur in the foregoing as I think I would have found myself obligated to do, in view of the modern precedents, in our recent case of Plazola v. United States, 291 F.2d 56, had I been a member of the division hearing that case.

I think I am as strong an opponent of "rough stuff" in law enforcement and of the "rap on the door in the night" as anyone. But there is nothing in the facts of Plazola and Contreras that offends my

notions of decent law enforcement under the Fourth Amendment. What would deter and what would discourage a good enforcement officer more than these decisions, I do not know.