MATTER OF CHEN

In Deportation Proceedings

A-15759498

*Decided by Board February 6, 1968*

Where, as a result of a routine Service investigative search made of a restaurant with the consent of the owner, an alien employee was arrested and a statement under oath thereafter obtained from him, such arrest was not illegal and the statement is properly admissible in evidence in deportation proceedings.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Crewman—remained longer.

ON BEHALF OF RESPONDENT:
Jack Wasserman, Esquire
Warner Building
Washington, D.C. 20004

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney

The special inquiry officer ordered the respondent, a native and citizen of China, deported. He found respondent had been admitted on January 12, 1967 at San Diego, California as a crewman, and had remained illegally in the United States after the period for which he was admitted. Respondent's appeal raises no question as to these facts, but contends that they have been found from illegally obtained evidence and cannot, therefore, sustain an order of deportation. Asserting no legal right to remain, he asks that he be permitted to depart voluntarily. We find the record properly establishes that the respondent is deportable. We shall dismiss the appeal.

Between 4 and 5 p.m. on September 14, 1967, experienced Service investigators at Washington, D.C., decided to check the employees of a restaurant to determine if any was an alien illegally in the United States. The investigation was a routine one. The investigators had no information that an alien illegally in the United States was employed there.

Investigator Taylor, a veteran with over 18 years of service, nine of which were as an investgator in the Washington area, was in charge of the operation. At about 7:30 p.m., he assigned an investigator to each

603

building exit (two side, one rear) and he and Investigator Podrasky entered by the front door (Podrasky was to keep an eye on those leaving by the front door). Taylor told the head waiter who greeted them, that they desired to check the employees for the presence of aliens illegally in the United States. The head waiter told them he would turn the matter over to Mrs. Malonson, a director of the corporation owner, who was then on the lower level of the restaurant. Mrs. Malonson came upstairs to Taylor. He identified himself and asked if the investigators could speak to those of her employees who were aliens. He told her this would be done quietly, in the easiest manner for all concerned, and without disrupting her operation. Mrs. Malonson stated that they were very busy, but made no objection, and she gave Taylor permission to check the employees (pp. 29–31).[1]

There is a conflict about respondent's entry on the scene. Inspector Griedel was posted at a side door exit. This is his testimony. About ten minutes after he had been posted, he saw respondent coming out of the side door. Griedel identified himself. Respondent ran back into the building. Griedel chased him through the kitchen, then down steps to the lower level where he caught up with him. Griedel asked respondent if he was a citizen. Although there was a language barrier, Griedel understood respondent to say that he was a student, and that he wanted to talk to the owner. Griedel followed the respondent to the upper level where Mrs. Malonson was talking to Taylor. Griedel told Taylor what had happened and turned the matter over to him (pp. 42–43; 48–54). Griedel did not have anything to do with the determination to arrest respondent (p. 60).

Respondent contradicted Griedel's story (pp. 62–63). (He testified only on the limited issue as to whether he was trying to abscond from the restaurant; he remained mute on advice of counsel as to other matters.) He made no attempt to leave the building. He was on the lower level gathering items for the kitchen. Griedel appeared behind

---

[1] Mrs. Malonson's testimony on this issue follows:

And there were, I believe, four or five Immigration inspectors that came in and I was downstairs at the time where he was, Mr. Chen [respondent] . . . I was told by the Maitre de (sic) that there were Immigration officers come to check everybody's identity. Everybody who was working on the premises. So first remark I made was that this was a heck of a time [it was the dinner hour] to try to find who is, who's got an identification card or not. However, I went upstairs and they said they would like to check everybody's identity, and as much as I objected to it I said, "That's fine with me.", and I told the Maitre de (sic) to bring just about everybody in the restaurant to the front and that they may check their identification (p. 72). (She also testified that about 150 people were in the restaurant and that the investigation interrupted the operation of the restaurant (pp. 71–74).)

him, identified himself, and asked for identification papers. He had none. Griedel took him upstairs where with the aid of another employee of the restaurant, he talked to Griedel (pp. 64-65).

Taylor corroborates Griedel's testimony. He saw Griedel, whom he had stationed outside, approaching with the respondent in front of him but not in custody (pp. 32-33; 35-37). Griedel told him that the respondent wanted to talk to the owner. He asked Mrs. Malonson if there was a quiet place where he could question respondent and asked if she could supply an interpreter. She sent over a waiter who spoke with the respondent and reported that they could understand each other. He identified himself. Respondent was not advised he was not required to answer questions or that he had a right to counsel. He asked the respondent how he came to the United States and if he had proof he was a student as he had claimed. Respondent had no proof. He was asked to show whatever documents he had to establish his immigration status; he produced a crewman landing permit showing that he had been admitted to the United States on January 12, 1967 and was to depart with his vessel, but in no event was to stay more than 29 days (Ex. 2).

Taylor decided that respondent was illegally in the United States, and that he was likely to abscond, because he failed to depart as required of those admitted as seamen, because Griedel had told him that the respondent had attempted to leave by the side door, because the alien refused to tell where he lived, and because the alien had no close relatives in the United States (p. 35). Taylor told the alien he considered him illegally in the United States. He took respondent into custody (p. 34) and with several other investigators brought him to the Service office.[2] They arrived about 8 p.m. A warrant of arrest was obtained and served at 10:12 p.m. The respondent was then taken to the police station where he was held overnight.

The following day Griedel took a statement under oath from the respondent. The respondent admitted he was a Chinese national who had entered as a crewman on January 12, 1967, and he had deserted his vessel on January 16, 1967 at Los Angeles, California (Ex. 5).

We resolve the conflict in the evidence in favor of Griedel. Respondent's credibility is questionable; he tried to pass as a student before both Griedel and Taylor. His story is improbable. We find it diffi-

---

[2] Before leaving, Taylor asked the owner if he could search the storage room. Mrs. Malonson left to speak to her husband about the request. He objected to such a search but she convinced him to cooperate (p. 75). She returned with the keys unlocked two or three doors which were closed and permitted Taylor to make a search. No one was found (pp. 39-40). Taylor questioned about six employees and Prodasky several others. There were about 24 employees in the restaurant (p. 74).

cult to believe that Griedel, without more, would have left his post unguarded to make his way into the interior of the restaurant. It is far more logical that he left to pursue the respondent, who fled after Griedel identified himself.

Counsel contends that when the exits to the restaurant were covered by Service investigators, the respondent's freedom of movement was restricted and this restriction constituted an arrest—one in violation of the 4th Amendment since it occurred without a warrant. He further contends that if the arrest did not occur then, it occurred when Griedel stopped and questioned the respondent.

We do not find that the posting of investigators was an arrest. Nor do we find Griedel's action in questioning the respondent constituted an arrest. This action is little different than a routine police field interrogation—a routine investigation of suspicious conduct. Such interrogation does not constitute an arrest (See *Poulas v. United States*, 95 F. 2d 412, 413, 9th Cir. 1938; *Peo v. Rodney P.* (Anon.), N.Y. Ct. App. 11/30/67, 36 L.W. 2377). Griedel did not take the respondent to Taylor, he accompanied the respondent to see Mrs. Malonson as the respondent had asked. We do not believe the arrest occurred until Taylor, after having examined the respondent, determined to his satisfaction that the respondent was illegally in the United States and told him that he was going to take him to the offices of the Immigration Service.

If Griedel's actions are considered an arrest, the arrest was a justified one. Griedel with knowledge that employees of the restaurant were to be questioned concerning their immigration status, saw the respondent attempt to leave the building shortly after Griedel's partners had entered the restaurant. The respondent could not speak English well and he ran when he became aware of Griedel's identity.

Taylor's interrogation of the respondent was justified under section 287(a)(1) of the Act (8 U.S.C. 1357(a)(1)) which gives service employees the right to interrogate without warrant any person believed to be an alien as to his right to be in the United States. Taylor's action in arresting the alien was justified under section 287(a)(2) of the Act (8 U.S.C. 1357(a)(2)) which authorizes the arrest of an alien whom the officer has reason to believe is in the United States in violation of law and "is likely to escape before a warrant can be obtained for his arrest." (See *United States v. Alvarado*, 321 F.2d 336, 2d Cir. 1963; *Pineiro-Lopez v. Kennedy*, 293 F.2d 540, C.A.D.C. 1961, cert. den. 368 U.S. 866; *Diogo v. Holland*, 243 F.2d 571, 3rd Cir. 1957; *Tsimounis v. Holland*, 132 F. Supp. 754, E.D. Pa., 1955.)

Counsel contends that the Service was not authorized under section 287 of the Act to enter the restaurant without a warrant. The con-

tention must be dismissed. Taylor went in to ask the owner for permission to question the employees. Service officers need no authority to enter a public place to ask the owner for permission to question his employees or to obtain his consent to search the place. (*Amaya* v. *United States*, 247 F.2d 947, 9th Cir. 1957, cert. den. 355 U.S. 916). Here there was an intelligent consent. Mrs. Malonson knew she could refuse a search. In fact she talked her husband out of his objection. There is no evidence that the consent was obtained by duress. Taylor testified he would have changed his plan if there had been any objection.

Moreover, it was not the search of the premises which resulted in the respondent's apprehension, (Taylor was still speaking to the owner about preliminary arrangements when respondent appeared before him and the owner (pp. 10–15)) but respondent's attempted flight from the building and the unsatisfactory explanation he gave.

Counsel's contention that the Service arrested respondent without first determining that he was likely to escape is contradicted by the evidence. Taylor, giving the basis for his conclusion, testified that he had determined that the respondent would abscond if not taken in custody (p. 35). Taylor's conclusion was a necessary and reasonable determination.

Counsel appears to be of the belief that an error was committed in arresting respondent without advising him that he was being detained because he might have absconded. No authority is cited for the contention. We find no error.

Counsel contends that the respondent's statement (Ex. 5) was made while he was under an illegal arrest, and that Exhibit 2, the crewman's landing permit (given up by the respondent but not taken from him (p. 56)), and other evidence obtained as a result of information furnished by the respondent (Ex. 3, Republic of China passport issued to the respondent; Ex. 4 crew list of the SS "Oriental Jade" which departed January 22, 1967 showing respondent had deserted) should have been suppressed. We do not believe the arrest was illegal. We believe the evidence was properly in the record and it was proper to consider it.

The special inquiry officer denied respondent's request for voluntary departure because the respondent had refused to testify in connection with the application and had therefore failed to establish eligibility. Counsel contends respondent was compelled to forego testifying on the merits to preserve issues as to deportability and alienage. Counsel asks that voluntary departure be granted because respondent has no criminal record, he is gainfully employed, and he is in possession of

funds with which to depart. We believe the special inquiry officer correctly found that the respondent had failed to establish his eligibility for voluntary departure since he refused to be examined on the issue.

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.