**UNITED STATES of America,**
**Plaintiff,**

v.

**Leopoldo MONTEZ–HERNANDEZ, aka**
**Julian Perez, Defendant.**

**Cr. S–437.**

United States District Court
E. D. California.
Oct. 16, 1968.

John P. Hyland, U. S. Atty., Eastern District of Cal., Sacramento, Cal., for plaintiff.

Carl Stein, Sacramento, Cal., for defendant.

## MEMORANDUM AND ORDER

MacBRIDE, Chief Judge.

The defendant has moved under Rule 41(e) of the Federal Rules of Criminal Procedure for an order suppressing as evidence an immigration border crossing card, Form No. I–179, taken from defendant at the time of his arrest. This court held a hearing at which the following facts were developed.

On July 13, 1968, defendant and three companions, all Mexican, were traveling in a car in Bryte, California. Their car was stopped by immigration officers, who testified that the two men in the back seat had looked at them with apparent nervousness. Two officers got out of the immigration car and one approached the Mexicans' car from each side. They asked all occupants for "their papers." All parties including the officers spoke in Spanish. One officer testified that the defendant was in the back seat eating shrimp and that he was so nervous he spilled the shrimp on his pants. In response to the demand for papers, the defendant produced the piece of evidence in question and handed it to an officer. It proved to be an altered and fake Immigration Border Crossing Card. The defendant was then arrested. He now wishes this court to suppress the Border Crossing Card as the product of an illegal search and seizure.[1]

---

1. Both sides admit that defendant, although an alien, enjoys the protection of the Fourth Amendment, whether in the country illegally or not.

Defendant contends there was no probable cause for an arrest and that since there was no warrant, the search and seizure were illegal. The government contends that since the defendant voluntarily produced the card, there was no search and seizure. But even if there was, the government insists that the officers had the right to do what they did.

■ The question of whether there was a search and seizure at all is a troublesome one. It is true that the officers did not actually physically search the defendant. However, that does not necessarily mean that the defendant has no standing to assert rights under the Fourth Amendment. If there is sufficient coercion, a person may become the unwilling instrument of an illegal search and seizure of his own property in the presence of a law enforcement officer. Paquet v. United States, 236 F.2d 203 (9th Cir. 1956), cert. denied, 352 U.S. 926, 77 S.Ct. 222, 1 L.Ed.2d 161 (1956).[2] Certain elements of coercion are apparent; however, because of the view I take of the officers' actions, I need not decide whether there was sufficient coercion to allow defendant to invoke the Fourth Amendment in the absence of an actual police search of his person.

I shall assume without deciding that the protections of the Fourth Amendment are applicable in this situation. The defendant insists that in order to justify the search, the officers must have had probable cause to make an arrest when they stopped the car. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), cited by defendant, lends some support to this position. In that case the Supreme Court held that an arrest was made at the moment F.B.I. agents stopped a car and that evidence subsequently found in the car was inadmissible unless the agents had probable cause to support an arrest at the time they stopped the car.[3] However, the government there conceded that the arrest occurred when the car was first stopped. Later cases have held that an arrest does not take place as a matter of law when officers momentarily detain a person riding in a car. Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966); United States v. Williams, 314 F.2d 795 (6th Cir. 1963); cf. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960).

■ It is now clear that law enforcement officers may stop people for questioning[4] and searching[5] under suspicious circumstances falling short of probable cause. Detecting and apprehending illegal aliens is a special law enforcement problem. Congress has given immigration officers and employees the power without warrant "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C.A. §

---

**2.** On the other hand for cases lending some support to the government's theory. See e. g., Weaver v. United States, 374 F.2d 878 (5th Cir. 1967); Cotton v. United States, 371 F.2d 385 (9th Cir. 1967); Hester v. United States, 265 U.S. 57, 58, 44 S.Ct. 445, 68 L.Ed. 898 (1924). But see Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, 904 (1968).

**3.** It should be noted that the Court carefully pointed out that the F.B.I. agents had no statutory authority to do what they did unless an offense had been committed in their presence or they had reasonable grounds to believe that the person to be arrested had committed or was committing a felony. In the case at bar,

as will be subsequently discussed, the immigration officers had statutory authority to question suspected aliens as to their citizenship without probable cause for making an arrest.

**4.** Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, 913 (1968) (concurring opinion of Justice White); Wilson v. Porter, 361 F.2d 412, 415 (9th Cir. 1966): "We take it as settled that there is nothing ipso facto unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations."

**5.** Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

1357(a) (1). While defendant is not precise on this point, he appears to argue that this subsection of the statute does not apply to alien *motorists*. But no significant reason appears for distinguishing between allowing immigration officers to stop suspected pedestrians for questioning and allowing them to stop suspected motorists.[6] This statute has been held constitutional. Fernandez v. United States, 321 F.2d 283 (9th Cir. 1963); United States v. Correia, 207 F.2d 595 (3d Cir. 1953). Therefore, if it was constitutional to question defendant as to his citizenship, it cannot be unconstitutional to ask for proof or to look at that proof when offered by defendant.

■■ In a case remarkably similar to the instant case, the Ninth Circuit Court of Appeals has approved just such police action as occurred here. Contreras v. United States, 291 F.2d 63 (9th Cir. 1961). In that case appellants' vehicle was stopped seventy-two miles north of the Mexican border[7] for a "routine check for 'illegal aliens.'" 291 F.2d at 64. The court indicated that the officer was unquestionably justified in stopping the car to establish appellants' national-

ity. The court further indicated that a search of the car could have been justified if it was a reasonable means to determine the citizenship status of the car's occupants. If, in the instant case, the officers were justified in searching the car, they can hardly be condemned for merely asking for papers.[8]

■ If accepted, the defendant's argument would lead to a curious result. When stopped for questioning, if a non-English-speaking, Mexican farm worker refuses to produce identification, there is probable cause for arrest and any incident search would be legal. However, defendant's argument suggests that by voluntarily handing over the illegal immigration card, the alien could make his own prosecution impossible. Further, if immigration authorities were unable to question aliens as to their right to be in this country without some independent evidence that they were here illegally, their job would be impossible. Congress' passing of 8 U.S.C.A. § 1357, giving special authorization to immigration authorities, was a recognition of this fact.

■ The decision I reach here is fully consistent with the underlying purposes

---

6. Cf. People v. Mickelson, 59 Cal.2d 448, 450, 30 Cal.Rptr. 18, 380 P.2d 658 (1963). The parties have argued at length about the applicability of 8 U.S.C.A. § 1357 (a) (3) which provides that immigration officers and employees shall have the power without warrant "within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States * * *" This subsection appears to have been intended to apply to searches of vehicles for *concealed* aliens. In the instant case there was no search for an alien (he was clearly visible); the search (if any) was of the alien's person, not the vehicle in which he rode. Thus, this subsection does not apply.

7. The fact that the check in the case at bar occurred approximately 500 miles from the border is not a decisive distinction. There was evidence of an extraordinary number of illegal alien arrests in the area. This constituted probable cause for the routine check of vehicles leaving the farms. See Taylor v. Fine, 115 F.Supp. 68, 70 (S.D.Cal.1953).

8. Defendant has not seriously raised the Fifth or Sixth Amendments as a defense, nor could he. As the Supreme Court said in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966): "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." 384 U.S. at 477, 86 S.Ct. at 1629. The fact that there was one officer on each side of the car does not make this a "custodial interrogation" in the Miranda sense. It was only good police practice when approaching a car with four unknown suspects at night.

of the Fourth Amendment. "The basic purpose of this Amendment, as recognized in countless decisions of \* \* \* [the Supreme] \* \* \* Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). It cannot be considered an arbitrary invasion of privacy merely to ask for proper identification in an area known to contain large numbers of illegal Mexican aliens, particularly when the person being questioned gives the appearance of being nervous and being of Mexican ancestry. This is especially true when it is the only feasible way to apprehend the seemingly endless parade of aliens who escape detection at the border.

It is therefore ordered that defendant's motion to suppress be, and the same is, hereby denied.