MATTER OF WONG AND CHAN

In Deportation Proceedings

A-15759508-9

*Decided by Board February 6, 1969*

(1) Where, due to their suspicious actions, a Service investigator sought to interrogate respondents who tried to flee from him, but he was unable to do so due to a language barrier, whereupon he instructed a hospital security officer, without the knowledge of respondents, to stand guard over them while he went nearby to get the help of another investigator travelling with him and to seek the services of an interpreter, arrest of respondents did not occur with the stationing of the security officer, which was done merely to make it possible to interrogate respondents, but occurred when they were subsequently taken into custody by the Service investigators following interrogation revealing their illegal presence in the United States.

(2) Arrest of respondents without a warrant was proper since the Service investigators, being aware that respondents were illegally in the United States and that they had fled to avoid interrogation, could reasonably conclude that it was likely they would escape before warrants could be obtained.[*]

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Crewmen
—remained longer (each respondent).

ON BEHALF OF RESPONDENTS:
David Carliner, Esquire
Warner Building
Washington, D.C. 20004

ON BEHALF OF SERVICE:
R. A. Vielhaber
Appellate Trial Attorney

Respondents appeal from the special inquiry officer's order finding them deportable as charged. The appeals will be dismissed.[1]

---

[*] Affirmed, *see* 445 F.2d 217 (C.A. D.C., 1971).

[1] Separate hearings started on November 13, 1967, were consolidated by agreement and joint hearings were held thereafter. No one record contains the complete testimony. References to pages preceded by "R" will be found in either record. Page references not attributed to the Chan record are from the Wong record. Exhibit references are to exhibits in record under discussion.

change Act of 1961 and authorizes a deviation from the stated guidelines on the part of Service officers when ruling on an exchange visitor's request for an extension of stay after admission or for additional time beyond the stated guideline upon an initial application for admission. The special inquiry officer has no authority to make such a determination.

We will next consider counsel's contention that the grant of voluntary departure with a provision for the automatic entry of a order of deportation upon failure to depart within the time limit set by the special inquiry officer violates due process because the respondent is denied an opportunity to show why she failed to depart or that her failure to depart is justified. We find no merit to counsel's contention. The regulations provide that if an alien wishes to extend the time within which to depart as specifed initially by the special inquiry officer, he may apply to the District Director having jurisdiction over his place of residence (8 CFR 244.2). The alien in support of such an application may submit evidence justifying the need for more time within which to depart. The regulation requires that written notice of the District Director's decision shall be served upon the alien and no appeal may be taken therefrom.

We find nothing in the "unusual circumstances" provision of 22 CFR 63.5(b) (*supra*[1]) which supports counsel's claim that the respondent should be given another hearing to show that her failure to depart within the time limit set by the special inquiry officer was justified by unusual circumstances. As stated above, 8 CFR 244.2 provides her with an opportunity to apply to the District Director for an extension of time within which to depart. The regulation promulgated by the Secretary of State (22 CFR 63.5(b)) in any event does not apply to the exercise of discretion in the grant of voluntary departure under section 244(e) of the Immigration and Nationality Act.

Due process does not require a ruling by the special inquiry officer on applications for an extension of stay, nor does it require that the deportation hearing be reopened for the reception of additional evidence on this issue. The position taken by counsel that the deportation hearing be reopened to afford an alien an opportunity to request additional time within which to depart voluntarily or to show why he failed to depart within the time limit set by the special inquiry officer would open the door to interminable delay and would effectively impede the deportation process. The automatic order of deportation is authorized by 8 CFR 242.18(c) and has been sanctioned by the courts. Cf. *Foti* v. *INS*, 375 U.S.

159

On advice of counsel, respondents remained mute at the deportation hearing. The special inquiry officer found that the Service evidence established that each respondent is an alien illegally in the United States since he remained without authority after he was admitted as an alien crewman from foreign for a period not to exceed 29 days. The special inquiry officer found one respondent to be Wong Tit Tit, who had been admitted about April 9, 1967, and the other to be Chan Nei Ngan who had been admitted about July 24, 1966. Counsel contends that respondents were arrested illegally and that deportability is not properly established because the evidence used was obtained as a result of the illegal arrest.

The testimony of Service investigator Taylor (corroborated by Service investigator Reissig in essential details as to those matters in which both took part) is to this effect: he and Reissig went to a hospital clinic to investigate the immigration status of a Chinese person who had applied for medical treatment as a charity case. Reissig remained in the Service car in front of the hospital. Taylor went to the clinic where the applicant for medical assistance, Wong Wook Wong, brother of respondent, Wong, and two companions (one, Yee Kang Ling, the other unidentified) were standing before the clinic interviewer. As he identified himself, preparatory to questioning Wong Wook Wong, his suspicion was aroused by the sudden departure of two Chinese men who had been sitting in the rear of the room (pp. 7, 11, 27–28, R 8–10). However, he continued the questioning of Wong Wook Wong until satisfied that no immigration problem was involved. This took about 15 minutes (p. R 29). Then he looked for the two men who had so suddenly departed. Unable to find them after glancing through the rooms and corridors on the ground floor, he notified his partner to watch the front exit and went, by way of the rear door, to the parking lot at the side of the building (pp. R 30–31). About 10 to 15 minutes had elapsed since he started searching. In the parking lot, he saw the two men. They looked back. Upon seeing him they quickened their pace and disappeared from view (pp. 8, R 31–35). He followed and discovered them in a car. One man attempted to lock the door of the car, apparently to prevent him from talking to them, the other attempted to start the car but apparently, because of his unfamiliarity with the operation, was unable to do so (pp. 8, R 10–11, 33). He attempted to question them, but could not communicate with them: he could speak no Chinese and they no English (pp. 9, R 12). He decided to get Reissig's help, and to talk to the three Chinese men in the

clinic who he thought might have some connection with the two men (p. 9). He took the car keys (pp. 10, R 11, 13). Identifying himself to a uniformed hospital security guard who was walking nearby, he asked him to watch the two men (who remained in the car) and to prevent them from leaving, if it became necessary (p. 9, R 39-41). The respondents could not have heard him (pp. R 12-13). The security officer was about 8 to 10 feet away from the car on an elevated sidewalk (pp. R 11-12). He found Reissig and drove with him to the parking lot. There they blocked the car in which the two men were still sitting. Reissig also was unsucessful in communicating with them (pp. R 13, 40). He (Taylor) noticing a young Chinese man (one he had not seen before) walking on the sidewalk, asked him to try to act as interpreter. The young man agreed (pp. 9-12, R 13, 36-37). Leaving the questioning to Reissig, he (Taylor) returned to the hospital to seek the three Chinese men (pp. R 13, 37-38). Yee Kang Ling, when shown the keys, said the car was his. Taylor gave him the keys and asked the three to come to where the others were (pp. 10, R 14). When they arrived (Reissig said it was about ten minutes after Taylor had left (pp. R 48, 54)) he learned that Reissig, with the help of the volunteer, had discovered the identity of the two men and the fact that they were illegally in the United States (pp. 10-12, 23-24, R 14-15). The investigators then determined to arrest the respondents. They escorted them to the Service office (pp. 11-12, R 15) where they questioned them and took affidavits.

The security officer testified (pp. R 61-73) that while Taylor had not specifically asked him to prevent the men from leaving, if they had made the attempt, he would have tried to stop them (p. R 66). He had them under observation for 5 to 7 minutes (p. R 66). He believed that they were unaware that he was watching them (R 66). He verified the use of the volunteer interpreter (pp. R 63-64, 67-68, 72-73).

The special inquiry officer found that alienage was established in each case by a seaman's discharge book (Ex. 4) and seaman's identity book (Ex. 5). In Chan's case he also considered a seaman identification card (Ex. 6). These documents came from the Service files (p. R 22). The special inquiry officer found the illegality of the respondents' stay established by their crewman's landing permit (Form I-95A) (Exs. 3) showing the date, place and manner of admission. Whether Chan had his permit with him when apprehended or whether as was Wong's it was delivered to the Service by Yee at the Service request, after the Service had ques-

tioned the respondents in the Service office, is not clear (pp. 16–19, R 15–23).[2]

Counsel contends that the respondents' arrests were made without probable cause and therefore without authority. This contention is based on the belief that the arrests occurred when Taylor had the security officer stand watch over respondents to prevent them from leaving the automobile. Counsel points out that this occurred before there had been any conversation with respondents that would have enabled Taylor to believe he had cause to make an arrest. He also contends that the evidence fails to establish that there was any meaningful conversation with respondents before they were taken to the Service office. He contends the record fails to establish that a volunteer acted as interpreter: he points out the Service did not produce the volunteer, that Yee's affidavit, which is in the record, makes no reference to the presence of the volunteer, that the respondents told Yee that there had been no conversation between them and the Service officers, and that there had been no volunteer who had spoken to them while they were in the automobile. Counsel contends that the evidence used at the deportation hearing was obtained as a result of the illegal arrest and therefore could not be used to deport respondents.

The special inquiry officer ruled that the arrests occurred when the investigators decided to take respondents to the Service office. He held the arrests were legal and that the evidence later secured, except for the affidavits, could be considered in determining deportability. The special inquiry officer ruled out use of the affidavits because they had been taken without respondents being advised of their right to counsel, although the regulation (8 CFR 287.3) required persons arrested without a warrant to be advised of this right. The special inquiry officer found that the following facts clearly established that the Service investigators had learned before respondents' arrest that they were illegally in the United States: the testimony of the Service investigators as corroborated by the security officer, the weak nature of the respondents' rebuttal through Yee's affidavit, and the possibility that Yee was absent during the time the volunteer had been used. The special inquiry officer did not deal with whether an arrest might have occurred before the Service officers learned through the volunteer

---

[2] Form I-95A is inadvertently referred to as Form I-94 at the reopened hearing of May 1, 1968 and in the special inquiry officer's order of July 8, 1968.

that the respondents were illegally in the United States. The point was raised at the hearing (p. 13).

Immigration provisions which authorize the questioning and arrest of aliens and are pertinent to the issue here follow:

. . . The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, . . . . (sec. 235(a) of the Act, 8 U.S.C. 1225(a)).[3] Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest . . .

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States; . . . . (sec. 287(a) of the Act, 8 U.S.C. 1357(a)).

Definitions—(a) (1) *External boundary.* The term "external boundary," as used in section 287(a)(3) of the Act, means the land boundaries and the coast line of the United States, including the ports, harbors, bays and other enclosed arms of the sea along the coast, and a marginal belt of the sea extending three geographic miles from the outer limits of the land that encloses an arm of the sea.

(2) *Reasonable distance.* The term "reasonable distance," as used in section 287(a)(3) of the Act, means within 100 air miles from any external boundary of the United States or any shorter distance which may be fixed by the district director . . . . (8 C.F.R. 287).

Counsel seeks to place the issue in terms of the power of a Service investigator to indiscriminately detain and arrest a person. We need not pass on this contention for it is not the situation presented here. There are several important differences. Taylor did not indiscriminately approach respondents: their actions gave him reason to believe they should be questioned. Then, Taylor did not seek the aliens to arrest them: he sought to question

---

[3] See *Nason v. INS*, 370 F.2d 865, 868 (2 Cir. 1967), (same case, different issue, 394 F.2d 223, cert. denied 21 L.Ed. 2d 101); *Sherman v. Hamilton*, 295 F.2d 516 (1 Cir. 1961) cert. denied 369 U.S. 820. But see *Lee Tin Mew v. Jones*, 268 F.2d 376 (9 Cir. 1959).

them. Finally, the elements of an arrest did not exist until Taylor took the aliens into custody. In addition, consideration must be given to the fact that Taylor was acting in an area where immigration officials have broad power. We shall discuss these points in detail.

The record shows that Taylor originally sought to question the respondents because of an on-the-scene occurrence, which to this alert investigator, seemed a suspicious circumstance. Taylor, an investigator with over 18 years of experience, could well have considered the sudden departure of the respondents as connected with the fact that he had just identified himself as an Immigration official and he could reasonably have concluded that they wished to avoid the possibility of an interrogation as to their identity and right to be in the United States. These inferences seemed all the more the probable explanation of thier sudden departure when he observed that they looked back as if to learn whether they were being followed, that they quickened their pace when they saw him, and that the sought to lock him out of the car and to drive away. Finding that the respondents spoke no English, and still merely desiring to talk to them, not to arrest them, it was reasonable for him to pursue his investigation by getting the help of his partner, seeking the services of interpreters he believed were nearby, and taking steps to assure the presence of the respondents for questioning—a questioning he obviously believed would take place within a relatively short time. Taylor acted reasonably in seeking to question respondents (see e.g., *McLester* v. *United States*, 306 F.2d 880 (10 Cir. 1962), cert. denied, 379 U.S. 1001 (1965).

It is important to note that Taylor sought to question the respondents, not to arrest them. There is an important distinction between the two actions. It is well settled that a law enforcement official may, in the performance of his duty, temporarily detain and question an individual without placing him under arrest. *Rios* v. *United States*, 364 U.S. 253 (1960); *Shorey* v. *Warden*, 401 F.2d 474 (4 Cir. 1968); *Allen* v. *United States*, 390 F.2d 476 (D.C. Cir. 1968); *Arnold* v. *United States*, 382 F.2d 4 (9 Cir. 1967); *Gilbert* v. *United States*, 366 F.2d 923 (9 Cir. 1966) cert. denied 388 U.S. 922 (1967); *Wilson* v. *Porter*, 361 F.2d 412 (9 Cir. 1966); *United States* v. *Vita*, 294 F.2d 524, 529–530 (2 Cir. 1961); *United States* v. *Montez-Hernandez*, 291 F. Supp. 712 (E.D. Calif. 1968); *Matter of Chen*, 12 I. & N. Dec. 603. In seeking to question the respondents, there is no evidence that the Service officials threatened, harassed, abused them, or that the officials intended to arrest them up to the time they took them into

custody. The stationing of the security officer did not constitute an arrest because it was done, not with the intent of arresting the respondents, but merely to make it possible to interrogate them. We conclude, that in seeking to question respondents, the Service officers did not arrest them.

In order for an arrest to exist, it must appear that the arresting officer made known to the arrested person that he is under arrest. *Jenkins* v. *United States*, 161 F.2d 99 (10 Cir. 1947). In this context, the posting of the security officer did not constitute an arrest, because there is no evidence in this record that the respondents were aware that the security officer was standing guard over them, or that he had been instructed to stand guard over them, or that they considered themselves under arrest as a result of this incident. On this record, it is concluded that the arrest occurred after the Service officers learned that the respondents were illegally in the United States and took them into custody.

The decision to arrest the respondents without a warrant was proper since the Service investigators, being aware that the respondents were illegally in the United States and that they had fled to avoid interrogation, could reasonably conclude that it was likely they would escape before warrants could be obtained. Since the arrest of the respondents was legal, any evidence secured as a result of the arrest was properly considered and deportability was properly found by the special inquiry officer. *Ah Chiu Pang* v. *INS*, 368 F.2d 637 (3 Cir. 1966) cert. denied 386 U.S. 1037; *Shing Hang Tsui* v. *INS*, 389 F.2d 994 (7 Cir. 1968). Furthermore, deportability could be sustained on the evidence from the Service file establishing alienage, coupled with the presumption in section 291 of the Act (8 U.S.C. 1361).

Finally, although this is not a deciding factor, we must point out that Immigration officials have broad power within a reasonable distance from any external boundary of the United States and that Taylor was acting in such an area. See also *United States* v. *Glaziou*, 402 F.2d 8 (2 Cir. 1968). But see *United States* v. *Montez-Hernandez, supra*, at 715 n. 6.

We believe the special inquiry officer properly disposed of counsel's contention that the record does not establish that the services of a voluntary interpreter were used. The record clearly establishes that there is no merit in this contention.

ORDER: It is ordered that the appeals be and the same are hereby dismissed.

147