## MATTER OF AU, YIM AND LAM

### In Deportation Proceedings

A-15759505
A-15759506
A-15759507

*Decided by Board June 20, 1969*

Where Service investigators, having reason to believe aliens illegally in the United States were employed in a restaurant, entered the restaurant to question the employees; they limited their questioning to whether the person was an alien and, if so, whether he was legally in the United States; no force was used to enter or to interrogate and there was no harassment of employee or management, the investigators, upon seeing persons obviously of foreign descent attempting to flee, acted reasonably in taking steps to detain them for questioning as to their immigration status. Having determined they were aliens illegally in this country, it was reasonable to arrest them without a warrant, as clearly they were aliens likely to escape before a warrant could be obtained, and evidence obtained as the result thereof was incident to a lawful arrest and admissible in evidence in deportation proceedings.*

CHARGES:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—In United States in violation of law, entered after being refused permission to land as crewman. (AU)

Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Crewman, remained longer. (YIM and LAM)

ON BEHALF OF RESPONDENTS:
David Carliner, Esquire
902 Warner Building
Washington, D.C. 20004

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney

The special inquiry officer ordered the respondents deported on the charge which relates to each. They appeal on the ground that the evidence to establish deportability was obtained after an illegal arrest and search. The appeals will be dismissed.

---

* Affirmed, *see* 445 F.2d 217 (C.A. D.C., 1971).

The claim that there was an illegal arrest and search requires a presentation of the facts in detail. Except for one matter there is little conflict as to the facts.

Service investigators, believing that one or more Chinese aliens illegally in the United States were employed in a restaurant located in a hotel building, decided to enter the restaurant to question the employees as to whether they were aliens illegally in the United States. They had gone to the same restaurant for the same purpose on two or three occasions in the past year. They did not have a warrant of arrest.[1]

About 5:30 p.m. on October 31, 1967, eight or nine Service investigators went to the hotel building. They were Burns, Podrasky, Taylor, Lamoreaux, Kelley, Stephanadis, Smith and one or two more (p. R–18). With the permission of the hotel employee stationed there, Kelley and Lamoreaux entered the hotel by a side or rear door. Kelley remained near the door. He had a view of some hallways. He would have stopped anyone who tried to leave hurriedly. Lamoreaux, traveling through the hallways of the hotel, made his way to a restaurant room which had a door on a hallway. The door was open, Lamoreaux stationed himself in the hallway so that he could see into the room (pp. R–19, R–21, R–60, R–62). Burns, Podrasky and Taylor entered the restaurant by the front door. The disposition of the other investigators is not shown. The three who entered by the front door approached Park, the assistant manager, who was in charge. Burns and Podrasky identified themselves and carried on the conversation. Taylor took no part of the conversation (pp. 20–21, R–4). They were interrupted briefly when Park received a phone call. There is a conflict in the evidence as to what happened next. Park testified that Podrasky identified himself but did not ask for permission to go to the kitchen; that while he was on the phone, Podrasky said that he was from the Immigration Service and he has to go into the restaurant and question the employees; that Podrasky went on without waiting for permission; that as soon as he had hung up the phone, he dashed after Podrasky and offered to set up a small table in the dining room, to which he would send the employees whom Podrasky wanted to see; that Podrasky did not answer, but asked for the direction of the kitchen; that he pointed

---

[1] The District Director has discretionary authority to issue an administrative warrant for the arrest of an alien, if he determines that the arrest is necessary or desirable. 8 CFR 242.2(a). Ordinarily, the District Director does not issue a warrant of arrest until after the alien has been questioned and it is determined that a prima facie case of deportability exists.

out the direction; and that he did not tell Podrasky he could not go into the kitchen (pp. 39–43; 47–49). The investigators, on the other hand, testified that after Park hung up, they told him that they wished to talk to the employees, and that Park gave permission to go to the kitchen to talk to the employees (pp. 20–21, 31, R–2–R–4, R–47, R–70, R–72–R–73, R–75). Podrasky testified he could not recall Park offering to bring the kitchen employees to the dining room so that he could talk to them.

In any event, on the way to the kitchen, Burns stopped to talk to an employee. He saw a Chinese person, garbed in a kitchen worker outfit, running toward the front door. He ran after, stopped him at the door, identified himself, and invited him to come to the kitchen to talk. This person is respondent, Yim Tsz Ki (pp. 21–23, R–4–R–5). As Burns and Yim were going to the kitchen, a second Chinese person, dressed like the first, headed for the front door. Burns stopped him and also invited him to come to the kitchen. This person is respondent, Lam Sai Ting (pp. R–5, R–8). On the way to the kitchen, Burns and the two employees passed a room being remodeled to provide additional dining space. A door of this room led to the hallway of the hotel. Lamoreaux was standing in the hallway at the door. Lam ran for the door. Burns followed. Lamoreaux intercepted Lam. He found Lam could speak no English, but did learn that he was off a ship. He apparently determined at this time to take Lam into custody. All went to the locker room. There, Lam again admitted to Lamoreaux that he had jumped ship. Yim admitted to Burns that he had jumped ship. Burns considered the admission, a sufficient basis for detaining Yim (pp. 22–24, 28, R–7–R–9, R–14–R–16, R–26–R–27).

Taylor and Podrasky had gone on to the kitchen. They questioned employees there. Taylor noticed that an employee walked to the rear of the kitchen, where a door led to the hallway of the hotel. The employee spoke to two Chinese employees who were preparing food for their own consumption. They dropped their food and ran out through the rear exit. No inspector was stationed there. Taylor ran after them. They went in different directions. One was out of sight; he was not apprehended. Taylor caught up with the other, stopped him by taking his arm, and asked him to return to the kitchen. He did not hold him as they walked back. The chase took him past Kelley, standing off the hallway in which the chase took place. Kelley took no part in the chase. The third person is respondent, Au Yi Lau. In the kitchen, with the help of an employee, Taylor learned that Au had come

off a ship and had something in the locker room which might help to identify him. He walked Au to the locker room and left him with Burns and Lamoreaux, telling them that Au appeared to be a crewman, that he had tried to run, and that he might have something in the locker. Taylor returned to the kitchen to continue questioning the other employees (pp. R–70–R–74, R–77–R–79, R–81–R–82).

DeLucian, the kitchen supervisor, testified that when the investigators entered, he turned his back on them thinking they were part of the management staff, that suddenly he saw employees taken out to the locker room through the rear exit, that the investigator had come through the rear door, and that he had not been approached for permission to question the employees. He testified that he made himself understood to the respondents in broken English. Park had testified that respondents could speak no English: he made himself understood by writing Chinese characters.

The one illegal alien, known by name, who the Service thought was working in the restaurant, was not found and is still the object of search (pp. R–51–R–52).

The investigators took the three respondents to the office of the Immigration Service. There, friends came to visit them (pp. 27, R–10). Fingerprints were taken (p. 12). Translators were obtained and statements taken: Kelley took Yim's (Ex. 2), Lamoreaux took Lam's (Ex. 2), Burns took Au's (Ex. 4) (pp. 16–17, 25–27, R–10, R–27–R–29, R–32–R–44, R–52–R–56, R–58–R–59, R–63–R–66). At the Service office, warrants of arrest were issued and served about two hours after the aliens were located (p. 14).

An investigation at the same place subsequent to the one in question, resulted in the apprehension of other aliens illegally in the United States (p. R–67).

Deportation hearings were started on November 1, 1967. At the hearings, which were consolidated, the respondents remained mute. The Service introduced the statements made by the respondents. The investigators who took the statements and an interpreter testified as to the taking of the statements and as to their belief that they represented what the aliens had stated. As to each alien, the Service introduced a seaman identity book and a seaman discharge book (Yim, Ex. R–1; Lam, Ex. R–3; Au, Ex. R–2); and crewman landing certificates (Yim, Ex. 4; Lam, Ex. 3; Au, Ex. 2). A certificate of vaccination was also introduced for Yim. The respective identity and discharge books contain photo-

graphs which the special inquiry officer found to be good like-nesses of the respondents. Counsel does not believe the likenesses exist (pp. R–6–R–7, R–11, R–30).

If the evidence presented by the Service is competent, it establishes the respondents are deportable aliens. See *Shing Hang Tsui v. INS*, 389 F.2d 994 (7 *Cir.*, 1968). The statements of the respondents alone establish that they are aliens illegally in the United States.[2] Apart from the statements, the landing certificates establish alienage and the illegality of stay. The seaman's books establish identity of the respondents. There must be considered the presumption that the alien in deportation proceedings, who has failed to show the manner of his entry, is in the United States in violation of law. *Au Shin Pang v. INS*, 368 F.2d 637 (3 Cir., 1966) cert. denied 386 U.S. 1037.

Counsel contends the evidence presented by the Service cannot be used because it was illegally obtained since Park's testimony reveals that the investigators were not given permission to enter the premises to conduct a "search" and since the Service had no right to approach at least the alien in the kitchen. He contends the testimony of Park should be credited rather than the testimony of the investigators because Park is a disinterested witness, but it is in the interests of the investigators to show they were performing their duties. He also contends the Service must establish that permission was granted by evidence that is clear, convincing and unequivocal. The appellate trial attorney emphasizes that Park's own testimony reveals both that he consented to the investigators talking to the employees and that he did not deny the investigator the right to go to the kitchen. The appellate trial attorney also relies upon the corroboration found in the testimony of the Service investigators.

It is undisputed that the investigators had permission to be in the restaurant. The only issue is whether they had permission to

[2] The statements reveal the following: Yim, a 33-year-old native of China, admitted as a crewman on June 21, 1963, (a typographical error: 1967 was obviously meant) deserted the ship at Baltimore on July 7, 1967. Lam, a 42-year-old native and citizen of China, admitted as a crewman about July 12, 1967, deserted his ship about July 15, 1967. Au, a 48-year-old native and citizen of China, after being refused permission as a crewman, deserted his ship on July 12, 1967. We have carefully examined the record as to the manner of taking of the statements. We find the statements were made by respondents with full knowledge of their constitutional rights to remain silent and to consult with attorneys, that there was no element of duress, and that the interpretation was properly made. None of the aliens testified that the statements are inaccurate in any material matter.

go to the kitchen. We believe the Service has established that Park gave the investigators permission to speak to employees of the restaurant at their jobs and that he made no exception as to the employees who were in the kitchen. The investigators who were with Park are of the belief that he granted them permission to question the employees in the kitchen. Podrasky testified that he could recall no offer to bring the aliens out of the kitchen; and that he was invited into the kitchen (p. R–51). Taylor was of the belief that Podrasky had received permission to go to the kitchen (p. R–75). Burns testified that Podrasky asked Park for permission to speak to the employees and that in response, Park led the way to the kitchen (pp. R–3–R–5). The special inquiry officer, who observed the witnesses testify, resolved the conflict in favor of the Service. We see no reason on this record for reversing his finding.

Moreover, no respondent was approached in the kitchen. Two respondents, Yim and Lam, were approached in the restaurant—no issue is raised about Park granting the Service permission to talk to the employees there. Au was approached in the public hallway of the hotel where permission to enter, if it was needed, was obtained when the hotel employee stationed at the door permitted the Service investigators to enter with knowledge of their employment. (See *Peters* v. *New York*, 18 N.Y.2d 238, 273 N.Y.S.2d 217, 219 N.E.2d 595, hallway in apartment house a public place.)

While we have considered the question of permission—and we believe that Service employees should ask for permission as a matter of practice—the fact is that law enforcement officers are not required to obtain permission to enter a public place, like a restaurant, to question people there. *Amaya* v. *United States*, 247 F.2d 947 (9 Cir., 1957) cert. denied 355 U.S. 916. See *Terry* v. *Ohio*, 392 U.S. 1, 34 (White, J., concurring); *Green* v. *United States*, 259 F.2d 180 (D.C. Cir., 1958) cert. denied 359 U.S. 917 (1959). Furthermore, the power of an immigration employee to question appears to be even broader than that possessed generally by law enforcement officers. Section 287(a)(1) of the Act (8 U.S.C. 1357(a)(1)) provides as follows:

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

Under this statute, it would appear no independent evidence of alienage is needed to approach a person. If independent evide⌐

is needed, it can be found in the reasonable suspicion that a person is an alien. A suspicion can be reasonable one if no more appears than that the person approached is in an area in which illegal aliens are found. *United States* v. *Montez-Hernandez*, 291 F. Supp. 712, 714–15 (E.D. Cal. 1968). See *Abel* v. *United States*, 362 U.S. 217 (1960); *Yam Sang Kwai* v. *INS*, No. 21,784 (D.C. Cir. February 17, 1969), petition for certiorari pending, No. 1220, October Term, 1968; *Amaya* v. *United States, supra; Matter of Wong and Chan,* Interim Decision No. 1941 (BIA, 1968); *Matter of Doo,* Interim Decision No. 1911 (BIA, 1968); *Matter of Chen,* 12 I. & N. Dec. 603 (BIA, 1968).

Considering the facts of the instant case in light of the precedents we hold that it was proper to question the respondents and it was proper to arrest them. Evidence, if any, obtained as the result of the arrest was incident to a lawful arrest and was therefore competent.[3] We shall develop these matters further.

It was proper to question respondents. The posting of the Service investigators did not constitute an arrest. *Yam Sang Kwai, supra.* The experienced Service investigators had reason to believe that illegal aliens were employed in a restaurant. They entered it to question the employees. They limited their questioning to whether the person was an alien and, if so, whether he was legally in the United States. These were matters within their authority. They did no enter to secure evidence for criminal prosecution. No force was used to enter. No force was used to question the employees. There was no harassment of employee or of management. Interference with business was so limited that the kitchen supervisor thought, at first, that the investigators were part of the management. There was no search of any employee except those who attempted to flee. When the investigators saw persons, obviously of foreign descent, moving to make it impossible for them to be questioned, the investigators acted reasonably

---

[3] Whether any evidence was obtained from the respondents at the time of the arrest at the restaurant is not clear (See p. R-27). If anything was obtained, it is not shown that it was not voluntarily produced. No respondent has alleged that anything was taken from him. Statements made by respondents after they were arrested could be used at the deportation hearing. *Shing Hang Tsui, supra.* Documents which the respondents apparently left on their ships and which came into the possession of the Service in some undisclosed manner and landing certificates taken from the Service files were properly introduced.

in taking steps to detain them for questioning as to their immigration status.[4]

The respondents were properly arrested. When the investigators determined that the respondents were aliens illegally in the United States, it was reasonable to arrest them without a warrant for, clearly, they were aliens who were likely to escape before a warrant could be obtained. Section 287(a) (2), 8 U.S.C. 1354(a) (2); *Yam Sang Kwai, supra* (concurring opinion).

Since it was reasonable to arrest the respondents, evidence obtained as the result of the arrest, if any was obtained, was incident to a lawful arrest and was therefore competent.

*Katz* v. *United States*, 389 U.S. 347 (1967); *Wolf* v. *Colorado*, 338 U.S. 25 (1949) (overruled, *Mapp* v. *Ohio*, 367 U.S. 643 (1961)); *Gomez* v. *Layton*, 394 F.2d 764 (D.C. Cir., 1968) cited by counsel are inapposite. *Katz* concerns eavesdropping by electronic means. It did not involve the right to question a person. *Wolf* concerns evidence admittedly seized illegally. We find no illegality in the obtaining of evidence here. *Gomez* merely held that one claiming an unconstitutional deprivation of liberty of movement was entitled to a judicial hearing on his claim.

**ORDER:** The appeals are dismissed.

---

[4] Counsel contends that Burns had no cause to arrest Au merely because of Au was progressing toward the front exit and was in an employee's uniform. Counsel believes that it was error to stop Au because if he were attempting to flee, he could have been apprehended by investigators who, counsel alleges, were stationed outside the building. Burns did not arrest Au for running away. He stopped him for questioning. He was authorized to do this. He did not arrest Au until he found that Au was illegally in the United States.