MATTER OF SANDOVAL

In Deportation Proceedings

A-20824162

*Decided by Board August 20, 1979*

(1) Exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect. . . ." *United States* v. *Calandra,* 414 U.S. 338, 348 (1974).

(2) The United States Supreme Court has never applied the exclusionary rule to exclude evidence from purely civil proceedings.

(3) The issue of whether the Fourth Amendment exclusionary rule should apply in deportation proceedings must be resolved upon a pragmatic analysis of the purposes underlying the rule, the efficacy of the rule as applied in deportation proceedings to serve its remedial objectives, the societal costs incurred by the exclusion of reliable and probative evidence from deportation proceedings, and the available alternatives to deter unlawful conduct by immigration officers.

(4) If an immigration officer violates an individual's Fourth Amendment rights during an investigation, the evidence resulting from the violation will be excluded from any subsequent criminal prosecution.

(5) The application of the exlusionary rule to deportation proceedings would not offer any significant additional disincentive to misconduct on the part of immigration officers.

(6) The application of the exclusionary rule to deportation proceedings would result in societal costs, which could be avoided if the more direct and timely alternatives, which presently exist, were utilized to curb misconduct by immigration officers.

(7) When the remote likelihood that the exclusion of evidence seized in violation of an individual's Fourth Amendment rights would significantly affect the conduct of immigration officers is balanced against the societal costs that could arise from such action and the alternatives available to compel respect for constitutional rights, neither legal nor policy considerations dictate the exclusion of such evidence from deportation proceedings.

(8) Even assuming that the alien's admissions as reflected on the Form I-213 ("Record of Deportable Alien") arose as a result of an unlawful search of her apartment, the Form I-213 was admissible at the deportation proceeding and established her deportability by clear, convincing and unequivocal evidence.

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. 1251(a)(2)]—Entry without inspection

Lodged: Act of 1952—Sec. 241(a)(2) [8 U.S.C. 1251(a)(2)]—In the United States in violation of law having failed to establish the time, place and manner of entry as required under·sec. 291, I&N Act 8 U.S.C. 1361)

70

ON BEHALF OF RESPONDENT:
  Charles S. Sims, Esquire
  Melvin L. Wulf, Esquire
  American Civil Liberties Union
  22 East 40th Street
  New York, New York 10016

Attorneys of Record:
  Leon Rosen, Esquire
  60 East 42nd Street
  New York, New York 10017

Rhoda K. Dryer, Esquire
17 Old Colony Drive
Larchmont, New York 10538

ON BEHALF OF SERVICE:
  George Indelicato
  Appellate Trial Attorney

Lloyd A. Sherman
Trial Attorney

BY:  Milhollan, Chairman; Maniatis and Maguire, Board Members. Concurring Opinion, Board Member Farb. Dissenting in Part and Concurring in Part Opinion, Board Member Appleman

The respondent appeals from a decision of an immigration judge dated September 30, 1975, finding her deportable as charged and ordering her deportation to Mexico. The appeal will be dismissed. We will, however, grant the respondent voluntary departure under section 244(e) of the Act, 8 U.S.C. 1254(e).

The respondent is a married 36-year-old native and citizen of Mexico. She entered the United States in March 1975. She and her husband crossed the border at night and were not inspected by immigration officers. The couple subsequently made their way to New Rochelle, New York.

On August 6, 1975, the respondent was taken into custody by immigration officers, who located her during a search of the building in which she resided. After being taken to a Service office and advised of her rights, she made a statement admitting her alienage and unlawful entry. She also supplied information resulting in the preparation of a Form I-213 ("Record of Deportable Alien").

On that same day, an Order to Show Cause was issued charging the respondent with being deportable under section 241(a)(2) of the Act, 8 U.S.C. 1251(a)(2), as one who entered the United States without inspection.

The deportation hearing was convened on August 22, 1975, and was conducted in several sessions, the last of which was on September 30, 1975. During these proceedings, an additional charge was lodged, alleging the respondent to also be deportable under section 241(a)(2) as one who was unlawfully in this country because she failed to establish the date, manner, and place of her entry as required under section 291 of the Act, 8 U.S.C. 1361.

By order dated September 30, 1975, the immigration judge found the respondent deportable as charged based on her statement of August 6,

1975, and on an admission made at the hearing that she was an alien followed by her refusal to answer subsequent questions regarding her entry.

Both below and on appeal, the respondent, through counsel, submits that her statement of August 6, 1975, and the resulting Form I-213, should have been suppressed as the "fruit of the poisonous tree"—it being alleged that the search of her apartment (which resulted in her detention) was in violation of the Fourth Amendment of the United States Constitution. It is also submitted that the respondent's admission of alienage before the immigration judge resulted from improper questioning subsequent to her invocation of her Fifth Amendment privilege against self-incrimination and that the admission, therefore, should not have been considered. The respondent further states that the immigration judge's conduct of the hearing evidenced a lack of impartiality and a denial of the respondent's Fifth Amendment due process right to a fair hearing. Finally, it is argued that the immigration judge improperly denied the respondent the privilege of voluntary departure after he refused to let her testify for the limited purpose of supporting her application for that relief.

As regards the evidence of deportability, we agree that the respondent's admission at the hearing concerning her alienage was elicited from her after she was improperly denied her Fifth Amendment privilege against self-incrimination. We will accordingly disregard the respondent's admission in this regard.[1] *See Tashnizi* v. *INS*, 585 F.2d 781 (5 Cir. 1978); *Valeros* v. *INS*, 387 F.2d 921 (7 Cir. 1967); *Estes* v. *Potter*, 183 F.2d 865 (5 Cir. 1950), *cert. denied*, 340 U.S. 920 (1951); *Matter of R—*, 4 I&N Dec. 720 (BIA 1952). *See also* section 275 of the Act, 8 U.S.C. 1325.

In view of this finding, the sole evidence of record regarding deportability is that which the respondent alleges resulted from an unlawful search of her dwelling and which she submits should have been excluded from the proceedings below.

---

[1] The record suggests that the immigration judge repeatedly questioned the respondent concerning her alienage and directed her to respond to his questioning because she had not personally and expressly invoked her Fifth Amendment privilege regarding that matter. *See U.S. ex rel. Bilokumsky* v. *Tod*, 263 U.S. 149 (1923); *Laqui* v. *INS*, 422 F.2d 807 (7 Cir. 1967); *Chavez-Raya* v. *INS*, 519 F.2d 397 (7 Cir. 1975). Considering the respondent's statement that she did not "like to answer," counsel's explanation that she was in fact invoking the Fifth Amendment privilege, and the language barrier arising from a non-English speaking witness testifying through a translator, we are satisfied that the privilege had been invoked as to the question of alienage and that the subsequent directions to respondent to that question were improper. *Cf. U.S. ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U.S. 103, 113 (1927) (regarding privilege being "fairly brought to the attention of the tribunal which must pass upon it").

The facts of this case relating to the challenged search were not clearly developed in the 68-page record. Apparently, however, the respondent and her husband shared the third floor of a 3-story house with 2 other men and one of the men's children (some or all of these persons were related). The ground level apartment in the house belonged to the building's "caretaker" and was accessible by its own exterior door. The upper 2 stories were accessible by one outside entrance. This outside door was always kept locked and each of the tenants and the caretaker had a key. An inside stairway led from the second floor to the third floor, where the respondent resided. There was a door leading to the third floor of the house, which was kept closed, but which had no lock. There was no testimony as to whether the exterior of this door reflected that it led to a separate apartment.

According to the testimony of one of the inhabitants of the third floor of the house, at 6:00 a.m. on the morning of August 6, 1975, he received a telephone call warning him that immigration officers were coming. Approximately 15 minutes later he saw immigration officers outside the house. He did not hear the house bell ring or hear a knock, but assumed the caretaker let the officers into the locked building. Shortly thereafter, two immigration officers opened the door to the third floor area of the house, entered partially, knocked after they had stepped inside, and then searched the apartment.[2] The respondent's witness testified that no consent was given to search. The Service concedes that the investigators had no warrant. The immigration judge did not require either investigator to testify at the hearing.

The respondent and her husband were subsequently taken into custody and transported to a Service office, apparently after admitting their unlawful status. At 2:15 p.m. that same day, after being advised of her rights, the respondent signed an affidavit, admitting her alienage and her illegal entry into this country. It is this statement and the I-213 prepared in conjunction with it that the respondent urges must be excluded from evidence as the product of an illegal search. See Wong Sun v. United States, 371 U.S. 471 (1963) (regarding the suppression of verbal statements). Exclusion is argued solely on Fourth Amendment grounds, as the respondent makes no claim on appeal that her statement was either involuntary or otherwise inadmissible.

On these facts, if we assume that evidence unlawfully seized by immigration officers must be excluded from deportation proceedings, we would find that the respondent had come forward with sufficient

---

[2] On appeal, the respondent states, through counsel (Brief on Appeal, at page 4), that the 2 investigators, "wielding flashlights, burst through the front door of the apartment." Neither the testimony of the respondent's witness nor her own affidavit, however, supports this characterization of the agents' entry.

proof to establish a prima facie case of illegality so as to require the Service either to assume the burden of justifying the manner which it obtained entry to the respondent's apartment or to establish that the connection between the search and the resulting statement and Form I-213 had become sufficiently attenuated to dissipate any "taint." *See Brown* v. *Illinois,* 422 U.S. 590 (1975); *Nardone* v. *United States,* 308 U.S. 338, 341 (1939); *Matter of Tang,* 13 I&N Dec. 691 (BIA 1971). *See also United States* v. *Karathanos,* 531 F.2d 26, 34-35 (2 Cir. 1976), *cert. denied,* 428 U.S. 910 (1976). As that burden was not placed on the Service and as evidence justifying the search is not in evidence, we are faced with the issue of whether the exclusionary rule should be held applicable in deportation proceedings.[3]

A preliminary question in this regard is whether unlawfully seized evidence has previously been held excludable from deportation proceedings. Two early district court decisions[4] ordered the exclusion of such evidence and the Supreme Court in *dicta* in *U.S. ex rel. Bilokumsky* v. *Tod,* 263 U.S. 149, 155 (1923) stated that "it could be assumed that evidence obtained by the Department [of Labor] through an illegal search and seizure cannot be the basis of a finding in deportation." A leading immigration law treatise states that:

> It is undisputed ... that the Fourth Amendment's prohibition against unreasonable searches and seizures applies in deportation proceedings, and that evidence obtained as the result of an unlawful search cannot be used.[5]

Thus, one might assume that the issue has long been resolved.

During the initial 55 years following the *Bilokumsky* decision, however, we find no Federal Court decision either holding that evidence obtained through an unlawful search would be inadmissible in deportation proceedings or in fact excluding any such evidence. Moreover, the Board has never specifically reached this issue. Many decisions do exist in which the merits of a challenge to a contested search were addressed,[6] but over the cited period all reported cases were

---

[3] By memorandum, dated October 4, 1978, the General Counsel of the Service states that the Service position is that the exclusionary rule is inapplicable in civil deportation proceedings.

[4] *Ex parte Jackson,* 263 F. 110 (D. Mont. 1920), *appeal dismissed, sub nom. Andrews* v. *Jackson,* 267 F. 1022 (9 Cir. 1920); *United States* v. *Wong Quong Wong,* 94 F. 832 (D. Vt. 1899).

[5] Gordon and Rosenfield, *Immigration Law and Procedure* (Revised Edition 1977), at 5-31. No case cited in support of this principle, however, includes a holding in this regard or resulted in any exclusion of evidence from a deportation proceeding. *See Klissas* v. *INS,* 361 F.2d 529 (D.C. Cir. 1966); *United States* v. *Montez-Hernandez,* 291 F.Supp. 712 (E.D. Cal. 1968); *Roa-Rodriguez* v. *INS,* 410 F.2d 1206 (10 Cir. 1969).

[6] *See Hoonsilapa* v. *INS,* 575 F.2d 735 (9 Cir. 1978); *Cordon de Ruano* v. *INS,* 554 F.2d 944 (9 Cir. 1977); *Aguirre* v. *INS,* 553 F.2d 501 (5 Cir. 1977); *Ho Chong Tsao* v. *INS,* 538 F.2d 667 (5 Cir. 1976), *cert. denied,* 430 U.S. 906 (1977); *Vlissidis* v. *Anadell,* 262 F.2d 398 (7

resolved in the Government's favor, thus obviating the need to specifically reach the question now under consideration. This wealth of cases can be read either as assuming the excludability of unlawfully seized evidence or as declining to address that fundamental issue where not essential to do so.[7] In either case, however, during this 55-year period neither the Board nor any Federal Court either ordered the exclusion of any unlawfully seized evidence or reached the issue of whether such evidence should in fact be excluded from deportation proceedings.

Remarkably, not until 1977 do we find a Circuit Court decision specifically addressing the question. That year, the First Circuit Court of Appeals in *Wong Chung Che* v. *INS*, 565 F.2d 166 (1 Cir. 1977), held that the product of an unlawful search would be inadmissible in deportation proceedings. That decision, however, was based in large part on what was viewed as the long history of "assumed" inadmissibility rather than on a detailed analysis of the relative merits of excluding such evidence from deportation proceedings. *Compare Smith* v. *Morris*, 442 F.Supp. 712 (E.D. Pa. 1977), *appeal dismissed on other grounds sub nom. Smith* v. *INS*, 585 F.2d 600 (3 Cir. 1978) (exclusionary rule not applicable to deportation proceeding in which decision did not depend upon proof of specific events, but merely on proof of status).

Accordingly, as the Board has not previously resolved this issue, as we find only one contemporary Federal Court decision in which unlawfully seized evidence is specifically held to be excludable, and as we find no decision in which the appropriateness of applying the rule in deportation proceedings is analyzed in any detail, we will address the question as one of first impression.

The initial issue is whether relevant Supreme Court precedent mandates the conclusion that all unlawfully obtained evidence be excluded from civil deportation proceedings *without* further inquiry into the necessity, usefulness, and effect of the exclusion of such evidence within the context of immigration law. We find this not to be the case.

The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent

---

Cir. 1959); *Matter of Gonzalez*, Interim Decision 2536 (BIA 1976); *Matter of Burgos*, 15 I&N Dec. 278 (BIA 1975); *Matter of Scavo*, 14 I&N Dec. 326 (BIA 1973); *Matter of Tsang*, 14 I&N Dec 294 (BIA 1973); *Matter of Wong*, 13 I&N Dec. 820 (1971); *Matter of Tang*, 13 I&N Dec. 691 (BIA 1971); *Matter of Au, Yim and Lam*, 13 I&N Dec. 294 (BIA 1969); *Matter of Doo*, 13 I&N Dec. 30 (BIA 1968); *Matter of Chen*, 12 I&N Dec. 603 (BIA 1968); *Matter of D—M—*, 6 I&N Dec. 726 (BIA 1955).

[7] This Board has not previously intended to reach the issue decided today and withdraws from any language which may be read as suggesting otherwise. *See also Lee* v. *INS*, No. 77-2265 (3 Cir. filed Jan. 4, 1979); *Cuevas-Ortega* v. *INS*, No. 77-1630 (9 Cir. filed Jan. 2. 1979).

effect...." *United States v. Calandra,* 414 U.S. 338, 348 (1974). The Supreme Court has found that the "need for deterrence and hence the rationale for excluding evidence are strongest where the Government's unlawful conduct would result in the imposition of a *criminal* sanction on the victim of the search." (Emphasis supplied.) *Calandra* at 338. Thus, in certain criminal proceedings, the Court has assumed the necessity and efficacy of the "drastic measure" of excluding evidence as a means of deterring law enforcement officials from violating Fourth Amendment rights. *See United States v. Janis,* 428 U.S. 433, 459 (1976).

The Supreme Court, however, has "never ... applied [the exclusionary rule] to exclude evidence from a civil proceeding, federal or state." *United States v. Janis* at 447.[8] The Court in *Janis* did reference the "seminal" lower court decisions that had applied the exclusionary rule to civil proceedings involving "intrasovereign" Fourth Amendment violations, but expressly did not consider that situation. *Janis* at 456. In the same decision, the Court also noted without adverse comment that in "some cases the courts have refused to create an exclusionary rule for either intersovereign or intrasovereign violations in proceedings other than strictly criminal prosecutions."[9] Thus, it is not entirely clear that the Court would extend the exclusionary rule to exclude evidence in any civil proceeding. *See Todd Shipyards Corp. v. Secretary of Labor,* 586 F.2d 683, 689 (9 Cir. 1978) (questioning applicability of rule in OSHA proceedings). We are convinced, however, that if the rule were to be extended to apply in a given civil proceeding, the Court would only do so after balancing the likelihood of deterring misconduct by government officials against the societal costs imposed by rendering unavailable clearly probative and reliable evidence.[10]

Although deportation is a drastic measure and at times "the equivalent of banishment or exile,"[11] it has consistently been classified as a civil rather than a criminal procedure.[12] For this reason, every

---

[8] *See Janis* at 447 n. 17, regarding the exclusion of evidence from 2 proceedings which were in "substance" and "effect" criminal (*i.e.,* proceedings the subject of which were to "penalize for the commission of an offense against the law." *Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700 (1965)).

[9] *Janis* at 456. We note in this regard that all of the numerous reported cases which have considered the question have held the exclusionary rule inapplicable to probation revocation proceedings. *See United States v. Frederickson,* 581 F.2d 711, 713 (8 Cir. 1978) and the cases cited therein. *See also U.S. ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161 (2 Cir. 1970) (rule not applied in parole revocation proceedings).

[10] *See Stone v. Powell,* 428 U.S. 465, 488 (1976); *United States v. Janis, supra* at 447-460 (1976); *United States v. Calandra,* 414 U.S. 338, 349 (1974).

[11] *Delgadillo v. Carmichael,* 332 U.S. 388, 391 (1947).

[12] *See Woodby v. INS,* 385 U.S. 276, 285 (1966); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594 (1952); *Ramirez v. INS,* 550 F.2d 560, 563 (9 Cir. 1977); *LeTourneur v. INS,* 538 F.2d 1368, 1370 (9 Cir. 1976), *cert. denied,* 429 U.S. 1044 (1977); *Nai Cheng Chen v. INS,* 537 F.2d

court of appeals that has considered the issue has held that the absence of *Miranda* warnings does not render an otherwise voluntary statement inadmissible in a deportation case. *See Navia-Duran v. INS*, 568 F.2d 803, 808 (5 Cir. 1977); *Trias-Hernandez v. INS*, 528 F.2d 366, 368 (9 Cir. 1975); *Anila-Gallegos v. INS*, 525 F.2d 666, 667 (2 Cir. 1975); *Chavez-Raya v. INS*, 519 F.2d 397, 399-401 (7 Cir. 1975). Accordingly, we find no clear mandate to extend the Fourth Amendment exclusionary rule to apply in deportation proceedings without a further inquiry into the appropriateness of doing so. Instead, we find that this issue must be resolved only upon a "pragmatic analysis"[13] of the purposes underlying the exclusionary rule, the efficacy of the rule as applied in deportation proceedings to serve its remedial objectives, the societal costs incurred by the exclusion of reliable and relevant evidence from deportation proceedings, and the available alternatives to deter unlawful conduct by immigration officers.

The Supreme Court has held that the prime, if not sole, purpose of the exclusionary rule is to deter future unlawful police conduct. *United States v. Janis, supra* at 446; *United States v. Calandra, supra* at 347. It is well-settled that the rule is not calculated to "redress the injury into the privacy of the search victim"[14] and there would appear little support for the view that application of the rule is essential for the purposes of "judicial integrity."[15] Further, the rule's ultimate purpose is not to punish the Government for the wrongful acts of its agents. Thus, at a minimum, it would appear essential to a decision to apply the rule in deportation proceedings that we find that such application would have some meaningful effect on the future conduct or misconduct of immigration officers.[16]

We initially note in this regard that immigration officers are charged with investigating both civil and criminal violations of the

---

566 (1 Cir. 1976); *Avila-Gallegos v. INS*, 441 F.2d 1245 (5 Cir. 1971), *cert. denied*, 404 U.S. 946 (1971). *See also Abel v. United States*, 362 U.S. 217, 237 (1960):

    According to the uniform decisions of this Court, deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions. Searches for evidence of crime present situations demanding the greatest, not the least, restraint upon the Government's intrusion into privacy; although its protection is not limited to them, it was at these searches which the Fourth Amendment was primarily directed.

[13] *Stone v. Powell, supra* at 488

[14] *United States v. Calandra, supra* at 347.

[15] *Stone v. Powell, supra* at 499 (1976) (Burger, C.J., concurring); *United States v. Janis, supra* at 457.

[16] We limit our inquiry here to the question relating to the exclusion of evidence unlawfully seized by immigration officers. However, we find significant support in *Janis* for the conclusion that evidence unlawfully seized by federal and state police officers in pursuance of criminal investigations should not be excluded from deportation hearings (collateral, civil proceedings).

immigration laws. *See, for example,* sections 242(d) and (e), 252(c), 264(e), 266, and 274-278 of the Act, 8 U.S.C. 1252(d) and (e), 1282(c), 1304(e), 1306, 1324-1328 (criminal violations under Service jurisdiction). The criminal and civil investigations are routinely performed concurrently because an officer who suspects an individual of being unlawfully present in the United States will not ordinarily know in advance whether or not the individual may also have violated a criminal provision of the immigration laws. If an immigration officer violates an alien's rights under the Fourth Amendment during such an investigation, he knows that evidence resulting from that violation will be excluded from any subsequent criminal prosecution. *See United States* v. *Martinez-Fuerte,* 428 U.S. 543 (1976); *United States* v. *Brignoni-Ponce,* 422 U.S. 873 (1975); *United States* v. *Karathanos, supra.* Thus, if one starts with the premise that the exclusionary rule is an effective tool of deterrence, the question now before us is whether any *additional* significant deterrent effect would be served by ruling that such evidence should also be excluded from the related civil deportation proceeding.

At first appearance, it might seem that the deterrent effect on immigration officers of excluding unlawfully seized evidence from deportation proceedings could still be equated to the presumed effect on law enforcement officials of excluding such evidence from criminal proceedings. In both instances the evidence would be made unavailable in the proceedings that fall within the officers' "zone of primary interest."[17] The fact that deportation proceedings are civil in nature, however, creates further distinctions which make this comparison inapposite.

First, although there is no convincing empirical evidence that the exclusionary rule has operated to deter violations of Fourth Amendment rights by law enforcement officials, the Supreme Court has been willing to apply that "drastic measure" in various criminal settings based on its "own assumptions of human nature and the interrelationship of the various components of the law enforcement system." *United States* v. *Janis, supra* at 459. This willingness arises in part because the rationale for excluding evidence is strongest where criminal sanctions can result and because it was searches for evidence of crime to which the Fourth Amendment was primarily directed. In view of the absence of these factors in the civil setting, we are not convinced that the Court would "assume" the efficacy of the exclusionary rule as a meaningful tool of deterrence if applied in deportation proceedings.

Secondly, the civil nature of deportation proceedings creates a clear

---

[17] *Janis* at 458.

impact on the rule's potential effectiveness to deter future misconduct by immigration officers, even if it were extended so as to require the exclusion of unlawfully seized evidence in those proceedings. A significant number of deportation cases involve solely the question of a respondent's *present status*, as distinguished from criminal proceedings where the issues generally relate to a defendant's *past actions. See Smith* v. *Morris, supra.* In fact, in many deportation cases the sole matters necessary for the Government to establish are the respondent's identity and alienage—at which point the burden shifts to the respondent to prove the time, place and manner of entry. *See* section 291 of the Act. It is also true, in view of the civil nature of these proceedings, that the "body" or identity of an alien (as distinguished from alienage) is not suppressible as the "fruit of the poisonous tree" even if it is conceded that an illegal arrest, search, or interrogation occurred. *See Hoonsilapa* v. *INS, supra* at 738; *Wong Chung Che* v. *INS, supra* at 168; *Katris* v. *INS,* 562 F.2d 866, 869 (2 Cir. 1977); *Avila-Gallegos* v. *INS, supra* at 667; *Guzman-Flores* v. *INS,* 496 F.2d 1245, 1247-48 (7 Cir. 1974); *Huerta-Cabrera* v. *INS,* 466 F.2d 759, 761 n. 5 (7 Cir. 1972); *La Franca* v. *INS,* 413 F.2d 686, 689 (2 Cir. 1969). Once an alien's identity is learned, the Service can entirely avoid triggering the exclusionary rule in all cases where documents lawfully in the Service's possession evidence unlawful presence.

Accordingly, even if one presumes the existence of an immigration officer who would intentionally elect either to violate or not to violate an individual's Fourth Amendment rights based on whether his wrongful actions could result in evidence available for use in deportation proceedings, it is not clear that the application of the exclusionary rule would significantly impact on that officer's judgment because what is often the most damaging evidence resulting from an illegal search (the alien's "body") cannot be suppressed.[18] Thus, even if the exclusionary rule were applied in deportation proceedings, a presumed unscrupulous immigration officer would not be assured *prior* to his unlawful act that he would not be "rewarded" with damaging evidence which could result in an alien's deportation.[19] This Board is, therefore, not convinced that the adoption of the exclusionary rule in deportation proceedings would offer any significant additional deterrent to misconduct to an immigration officer who would otherwise intentionally

---

[18] By this analysis, we of course do not sanction any hypothetical misconduct. It is solely intended to illustrate the limitations of excluding evidence from deportation proceedings as a meaningful deterrent to immigration officers.

[19] Under these circumstances, only where the officer knew *prior* to the search that the individual was one for whom the Service had no records (*e.g.,* an alien who entered without inspection) or that the Service records alone could not result in a finding of deportability, could now even assume that the incentive for misconduct could be affected.

choose to violate an individual's Fourth Amendment rights in hopes of assisting in the alien's deportation.[20]

Against this somewhat questionable role as a tool of deterrence, one must consider the "societal costs" imposed by application of the rule. It might be presumed that these "costs" would be minimal in view of the fact that since 1899 we can find only two reported cases in which unlawfully seized evidence was in fact excluded from deportation proceedings and only one other case in which the applicability of rule was specifically addressed. Under such circumstances (even if one assumes that the Service may have elected not to issue Orders to Show Cause in some cases for fear that critical evidence might be found inadmissible), the rule would not appear to have the potential to significantly impact on this country's immigration laws and policies.

There are, however, "costs" which arise even when evidence is not ultimately excluded. Absent the applicability of the exclusionary rule, questions relating to deportability routinely involve simple factual allegations and matters of proof.[21] When Fourth Amendment issues are raised at deportation hearings, the result is a diversion of attention from the main issues which those proceedings were created to resolve, both in terms of the expertise of the administrative decision makers and of the structure of the forum to accommodate inquiries into search and seizure questions. The result frequently seems to be a long, confused record in which the issues are not clearly defined and in which there is voluminous testimony, but the underlying facts not sufficiently developed. The ensuing delays and inordinant amount of time spent on such cases at all levels has an adverse impact on the effective administration of the immigration laws, which to date (in view of the virtual absence of cases in which evidence has been ultimately excluded) has in no way been counterbalanced by any apparent productive result. This burden on the "system" is certainly not a basis in itself to conclude that such issues are not appropriate in deportation proceedings, but we think this effect is a relevant consideration when balancing competing interests and one which cannot be characterized as "trivial." *See Franks* v. *Delaware*, 98 S.Ct. 2674, 2682-2683 (1978). This is particularly true in a proceeding where delay may be the only "defense" available and where problems already exist with the use of dilatory tactics. *See, e.g., Vasquez-Contreras* v. *INS*, 582 F.2d 334 (5 Cir.

---

[20] *See*, Austin T. Fragoman, Jr., *Procedural Aspects of Illegal Aspects of Illegal Search and Seizure in Deportation Cases*, San Diego Law Review, Vol. 14, No. 1, Dec. 1976, at pp. 181-182, regarding impact of exclusionary rule as a deterrent to misconduct by immigration officer under present statutory and case law.

[21] Presently, in the majority of cases, deportability is conceded and the bulk of the hearing concerns applications for various categories of mandatory or discretionary relief from deportation.

1978); *Der-Rong Chour v. INS,* 578 F.2d 464 (2 Cir. 1978); *Ballenilla-Gonzalez v. INS,* 546 F.2d 515 (2 Cir. 1976), *cert. denied,* 434 U.S. 819 (1976); *Bufalino v. INS,* 473 F.2d 728 (3 Cir. 1973), *cert. denied,* 412 U.S. 928 (1973).

Other "societal costs" would arise in any case where the rule operated to preclude the deportation of an alien whose presence in this country was not lawful. We do not suggest that the "cost" of an alien's continued unlawful presence is in any way comparable to the "cost" of allowing a criminal to go free; the differences are of kind, rather than degree. A criminal may be given immunity for past conduct, but is never licensed to commit future crimes. However, where an alien whose status is not lawful is saved from deportation through the operation of the exclusionary rule, the result would be a sanctioning of a continuing violation of this country's immigration laws.

As a final consideration in this regard, we think it possible that the availability of the exclusionary rule in deportation proceedings would make it less likely that aliens and their counsel would pursue more direct and timely approaches to curbing violations of Fourth Amendment rights by immigration officers. It is not unreasonable to assume that an alien will be primarily concerned with his or her own status, and only secondarily concerned with the future actions of immigration officers. Thus, even though the suppression of evidence may be the most cumbersome and unproven tool of deterrence, it is the approach most likely to be pursued by an alien whose Fourth Amendment rights have been violated because of its "windfall" effect.

This last consideration is relevant only if other alternatives exist with respect to curbing such misconduct by immigration officers, but we find that alternatives are available. The most direct initial action that one can take when there is misconduct by an immigration officer is a formal complaint to his or her superior; in most instances relating to unlawful searches, the District Director. *See* 8 C.F.R. 100.2. *See also* Operations Instruction 287.10, March 15, 1978 ("The Service Professional Integrity Program"). There is no evidence suggesting that the Service is not responsive to complaints regarding employee misconduct. Such an approach provides no "windfall" to the alien, and offers significant advantages over the exclusionary rule in preventing subsequent misconduct. First, the action is direct and timely. It can follow immediately after the alleged misconduct and the complaint can be directed to the official responsible for supervising the day-to-day actions of the officer or officers in question. This approach does not rely on any presumption (which we think unfounded) that the officer will tailor his or her conduct based on an administrative or judicial decision that may come months or even years after the contested action, particularly when it is in no way clear that officers are even aware of

the ultimate disposition of the cases in which there are involved. Moreover, this approach has the benefit of forcing supervisory personnel to confront the issues and to clarify policies relating to searches and seizures. Where misconduct is determined to have occurred, the impact on the responsible officer can be significant, direct, and incapable of being ignored (*e.g.*, a fine, suspension, or dismissal). Equally as important, where improper actions are taken by an officer in good faith, education and training can be substituted for punishment.

We note in this regard that we are not dealing with a diverse group of law enforcement agencies responsible to various federal or state authorities. We are concerned with one federal agency and its officers, who are responsible to one agency Commissioner, and in turn ultimately responsible to the Attorney General of the United States. We are not satisfied—and have not been shown—that misconduct by Service officers relating to violations of individuals' Fourth Amendment rights cannot be adequately addressed within this forum.

Secondly, where the violations stem from unlawful Service policies rather than from individual misconduct, such policies regarding searches can be challenged in the Federal Courts by injunctive or mandamus actions—actions specifically designed to deter future misdeeds, rather than to punish for past conduct. *See Loya v. INS*, 583 F.2d 1110 (9 Cir. 1978); *LaDuke v. Castillo*, 455 F.Supp. 209 (E.D. Wash. 1978); *Marques v. Kiley*, 436 F.Supp. 100 (S.D.N.Y. 1977); *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062 (7 Cir. 1976), *modified en banc*, 548 F.2d 715 (7 Cir. 1977). These actions also directly impact on the perceived problem, rather than relying on any hope that an officer's conduct will be affected by the result of a subsequent proceeding in which he is neither a party nor (if we presume malevolence) much concerned.[22]

Finally, civil or criminal actions against the individual officer may be available. *See Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971). *See also U.S. ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161, 1164 (2 Cir. 1970); 18 U.S.C. 2234-2236.

We recognize the fundamental right of all persons in this country to privacy free from unreasonable state intrusion. We are sensitive to the fact that many persons journey to this country—at times at great personal sacrifice—in order to live in a society in which constitutional guarantees are meaningfully enforced. We simply are not convinced, however, that the exclusion of unlawfully seized evidence from deportation proceedings would in fact affect the conduct of any immigration officer who would otherwise malevolently violate individual rights.

---

[22] *United States v. Janis*, 428 U.S. at 448 n. 20.

Accordingly, when we balance what we consider to be the remote likelihood that the exclusion of unlawfully seized evidence from deportation proceedings would significantly affect the conduct of immigration officers with the societal costs that could result from such action and the alternatives available to compel respect for constitutional rights, we are not satisfied that either legal or policy considerations dictate the exclusion of unlawfully seized evidence from these proceedings.[23] In view of the foregoing, we find that the respondent's statement of August 6, 1975, and the Form I-213 were admissible in the proceedings below and that deportability under section 241(a)(2) of the Act was established by clear, convincing and unequivocal evidence.

Regarding the claim that the immigration judge was biased, disrespectful, and incompetent, we find that the respondent's contentions are not supported in the record. We do not agree that alleged errors in rulings and that which counsel perceives as "silly procedural technicalities" indicate either prejudice or incompetence requiring new proceedings before a different immigration judge. The record is at times confused and also suggestive of a strained relationship between the immigration judge and the respondent's three counsel (particularly on the part of counsel), but we find no manifestation of any "bias" on the part of the immigration judge as regards the respondent nor any impermissible restraint on counsel's representation of their client. We note that the immigration judge made various rulings in the respondent's favor, in fact elicited from the Service the fact that no warrant had been issued for the search in question, granted frequent recesses to the respondent to confer with her attorneys, accommodated every rescheduling request made by the respondent's counsel, and ultimately adjourned the proceedings and withheld his decision pending submission by the respondent's counsel of a brief in support of their motion. Our review of the record does not reveal "flagrantly injudicious conduct" (as submitted by counsel) resulting in a denial to the respondent of a fundamentally fair hearing.[24]

---

[23] Our decision in this regard, of course, does not affect the inadmissibility of evidence obtained in violation of a respondent's privilege against self-incrimination or of statements or admissions that are involuntary or coerced. See *Tashnizi* v. *INS, supra; Valeros* v. *INS, supra; Navia-Duran* v. *INS,* 568 F.2d 803 (1 Cir. 1977); *Bong Youn Choy* v. *Barber,* 279 F.2d 642 (9 Cir. 1960).

[24] It is submitted that the immigration judge was abusive and "shouted" during the proceedings; however, in response to a complaint in this regard he advised counsel that he was not raising his voice, but that it was his normal voice level and he wanted counsel to keep his "voice up." The record in fact reflects that on numerous occasions the immigration judge found it necessary to instruct the parties, including the Service's witness, to speak louder. It is also submitted on appeal that the immigration judge engaged in an improper *ex parte* conference with the trial attorney, a Service witness and the Chief Special Inquiry Officer. The record indicates, however, that at the

Finally, the respondent challenges the denial of voluntary departure. We are satisfied that she should, as a matter of discretion, be granted that privilege. The parties at the hearing appear to have been unclear as to the meaning of the regulatory language in 8 C.F.R. 242.17(d). In *Matter of Bulos*, 15 I&N Dec. 645 (BIA 1976), decided after the immigration judge's decision appealed from herein, we clarified that the testimony given in support of an application for voluntary departure may not be relied upon to base a finding of deportability. Considering that there appears little doubt as to the respondent's good moral character and in view of the understandable uncertainty at the hearing as to the advisability of answering all questions, we will grant to the respondent the privilege of voluntary departure.

The appeal will accordingly be sustained as to the denial of voluntary departure, and dismissed in all other regards.

ORDER: The appeal is dismissed, except as regards the denial of voluntary departure.

FURTHER ORDER: The outstanding order of deportation is withdrawn, and in lieu of an order of deportation the respondent is allowed to depart voluntarily, without expense to the Government, within 30 days from the date of this order or any extension beyond that time as may be granted by the District Director and under such conditions as he may direct. In the event of the respondent's failure so to depart, the order of deportation will be reinstated.

CONCURRING OPINION:  Ralph Farb, Board Member

The exclusionary rule is not applicable to deportation hearings, nor should it be.

Decision writers and commentators who assume its applicability have failed to discuss it deeply. It is as if it was casually assumed that, because the Fifth Amendment's self-incrimination clause applies and is operative to bar the use of involuntary statements, the same result must follow from violation of the search and seizure clause of the nearby Fourth Amendment. That the two are not analogous is easily demonstrated.

The very words of the Fifth Amendment, prohibiting the use of enforced self-incriminating statements in criminal trials, underlie the extension of the bar to civil and administrative proceedings where the

September 9, 1975, hearing the respondent's counsel stated only that it "appeared" to her that a conversation had occurred (the substance of which she did not know) during the course of the previous hearing when she and the respondent were conferring outside the hearing room. The immigration judge indicated that no conversation regarding the proceedings had occurred and, on this record, we find neither material error nor a need to pursue the matter.

Government is the adverse party. Moreover, such statements are suspect as to reliability and probative value.

By contrast, the Fourth Amendment in itself says nothing about use of illegally seized evidence. The exclusionary rule is not a personal constitutional right of an aggrieved party, it has never been interpreted as applying to all types of proceedings and it is not intended to give redress to the aggrieved party.

The deportation hearing process has never been linked to formal rules of evidence. Evidence which would be inadmissible in a courtroom may be received; if it is probative it may be relied upon to establish a fact. This is consonant with the overall approach to this type of administrative decision making. Neither illegality in the arrest nor irregularity in the contents of the initiating document necessarily stands in the way of a deportability.

For Fiscal Year 1977, the Immigration and Naturalization Service reported that it had located 1,042,000 deportable aliens. Of these, 939,000, or 90%, were listed as having entered without inspection. That means that for the vast majority there was no reason to expect that the Immigration and Naturalization Service records contained prior evidence of their identity as aliens. I am not condoning or encouraging violation of Fourth Amendment rights in the immigration investigator's search for solid proof of identity. If it were done deliberately, discharge from Government service would be appropriate. I simply don't see how we can reasonably bar the use of illegally obtained convincing proof that a person is an alien with no right of presence, when that may be all that will ever be available to identify him. It would be inconsistent with the manifest intention of Congress that the Immigration and Naturalization Service know the location of every alien in the country.

The Board's decision attempts to draw a distinction between immigration investigators and other types of law enforcement officers as to the hypothetical deterrent effect which might result from the imposition of the exclusionary rule on deportation hearings. I will have none of it. There is no reliable evidence of the effect of the exclusionary rule on conduct of police officers generally, and it is merely fanciful to make comparisons based on the supposed deliberate conduct of knowledgeable officers. Most violations of civil rights result either from ignorance or from excess of zeal. The calculating, unscrupulous officer belongs to fiction, not reality. Despite my reservation in this one regard I agree with the decision.

DISSENTING IN PART AND CONCURRING IN PART: Irving A. Applemen, Board Member

I concur only in the result reached in this case by the majority decision, not in its rationale. My divergence with my colleagues is three-fold: (1) Even assuming an unlawful arrest, the Service evidence in this case is admissible and alienage and deportability have been established by clear and convincing evidence, without any necessity for reaching the issue of applicability of the exclusionary rule; (2) Assuming any necessity for examining the arrest, the evidence respecting the claimed illegality is unsatisfactory in crucial areas, and a reopening of the proceedings is required before the applicability of the Fourth Amendment can be discussed, to determine if an issue actually exists; (3) Assuming *arguendo* the necessity for, and propriety of, reaching the issue, the exclusionary rule is applicable in deportation proceedings.

I

The Government's case rests on a Form I-213 (Record of Deportable Alien), an Affidavit signed by the alien, a Form I-214 (Advice of Rights), and the testimony of Investigator DiPlacidi.

DiPlacidi was responsible for the execution of these documents at the Immigration and Naturalization Service office. He was not the arresting officer. His initial action was to fully advise the respondent of her rights in her own language. The Affidavit (Exhibit 2) was taken from her in Spanish, written down in English and read back to her in Spanish. The Form I-213 (Exhibit 3) was filled out from information partly known to the investigator and partly furnished by the respondent. The Form I-214 is part of Exhibit 2 and notes the time of execution as 2:15 p.m., on the day of the arrest and the place as 20 West Broadway, New York City.[1] The Form I-213 and the affidavit state that the respondent is a native and national of Mexico who entered the United States without inspection in March 1975.

The I-213 shows that the alien was apprehended at her residence on August 6, 1975 at 6:30 a.m. during a "field investigation." The *Affidavit* recites that it was taken in Spanish by Investigator DiPlacidi, that he identified himself as an officer of the United States Immigration and Naturalization Service and informed her that he desired to take her sworn statement regarding her illegal entry into the United States. It contains warnings as to her right to remain silent; that anything she said might be used against her in a court or in an immigration or administrative proceeding; that she had the right to talk to a lawyer

---

[1] This is the location of the New York office of the Immigration and Natualization Service.

86

for advice during questioning; that if she could not afford a lawyer one would be appointed for her; that she had the right to stop answering questions at any time.

According to DiPlacidi, these warnings were given to her in Spanish and she fully understood them. Included in the preliminary warnings, is the statement "I am willing to make a statement without anyone else being present." Her signature appears on both pages. The warnings and statement of rights on the attached I-214 are also in the Spanish language, and are equally complete. The form concludes in substance, "I understand my rights, I am ready to make a declaration and answer questions. For now I do not desire a lawyer. I understand and know what I am doing. I have not been made any promises nor have I been threatened, nor has any pressure or force been used against me." It too bears her signature.

DiPlacidi testified that all information reflected in Exhibits 2 and 3 was freely furnished by the alien. No allegations have been made by the respondent, nor has there been any offer of proof that the information was furnished on other than a completely voluntary basis, without any coercion, duress or intimidation. There appears to have been complete compliance with the Service regulation governing arrest procedures.

Nothing in the evidence offered by the respondent in support of her motion to suppress, indicates that the arrest, even assuming *arguendo* that it was illegal, bore a relationship to the information furnished hours later at the Service office. The allegations in the respondent's affidavit in support of her motion to suppress relate only to the circumstances surrounding the arrest itself. Her supporting witness testified only as to what took place at the time of the arrest. We are being asked, with no evidentiary support whatsoever, to assume that a "taint" carried over *automatically* to these documents, notwithstanding their facial compliance with evidentiary due process requirements (*Trias-Hernandez v. INS*, 528 F.2d 366 (9 Cir. 1975)), the fact that they were executed at a time and place substantially removed from the scene of the arrest, and the buttressing testimony of the Service officer that the information was given freely and voluntarily.

It is appreciated that the bar of the exclusionary rule extends to verbal evidence as much as to other physical evidence. Under the holdings in *Wong Sun v. United States*, 371 U.S. 471 (1963), and *United States v. Karathanos*, 531 F.2d 26, 34-35 (2 Cir. 1976), the taint of an original illegal arrest can carry over to such evidence, and render it inadmissible. Nevertheless, it does not do so in all cases, and in all circumstances. The rule recognizes the possibility of attenuation. Clearly, verbal statements made at the time of an illegal arrest would be inadmissible under *Wong Sun*. At the same time a voluntary confes-

87

sion made several days after the arrest was held admissible in *Wong Sun*, because the connection between arrest and statement had been dissipated. This case falls somewhere in between. *United States* v. *Karathanos, supra,* has an additional element of a government promise to alien witnesses, of voluntary departure without prosecution, which helped to carry the original taint over to their testimony. No such element is present in this case, and *Karathanos* is not determinative on the facts here.

*Brown* v. *Illinois,* 422 U.S. 590 (1975), places a burden on the Government to show that a later admission was an act of free will unaffected by initial Fourth Amendment illegality. *Miranda* warnings *by themselves* do not break the causal chain. *Brown,* however, rejects any automatic "but for" rule. Whether a confession is the product of a free will under *Wong Sun, supra,* must be answered on the facts of each case. *Miranda* warnings are an important factor. So too are the temporal proximity of the arrest and confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown* v. *Illinois, supra,* at 603 and 604.

Measured against these criteria the Service has met its burden. There is unrebutted testimony and evidence as to much more than mere *Miranda* warnings. The warnings themselves were particularly full and complete. There was an intervening lapse of time of about seven hours (as against the less than two hours in *Brown*) between arrest and statement. There is no satisfactory showing of flagrant government misconduct, nor a deliberate Fourth Amendment violation "for investigation" or for "questioning" as was the case in *Brown* (See II—below). None of the evidence relied on was obtained at the time of the arrest.[2] Above all, there is the testimony of the Service officer respecting the completely voluntary nature of the admissions, to establish their lack of connection with the arrest. Under these circumstances, under the rule in *Wong Sun* v. *U.S., supra,* the admission cannot be rejected out of hand, as the majority has done.

In summary, the Service has met its burden by a combination of (1) the recitations of the documents themselves, (2) the testimony of the investigator, (3) the lapse of time, and (4) the removal to a different physical location. There is no evidence whatsoever, with respect to Exhibits 1, 2, and 3, even in the form of an offer of proof, let alone any testimony, that the respondent was in any way influenced by the circumstances of the arrest in giving the information in these exhibits.

---

[2] In this respect the case differs materially from *Wong Chung Che,* and *Wong Pui Tong* v. *INS,* 565 F.2d 166 (1 Cir. 1977), where the immigration judge had placed heavy reliance on a Crewman's Landing Permit obtained from the alien himself at the scene of the arrest.

Nothing whatsoever counters the substantial government showing that whatever taint there may have been in the arrest, would have been purged, and the causal chain broken. The admissions and exhibits must be taken at their face value.[3]

Under this view of the case, it is not necessary to reach the applicability of the exclusionary rule. Even assuming a Fourth Amendment violation, the exhibits were admissible and the government has met its burden of establishing alienage and deportability by clear and convincing evidence, *Woodby* v. *INS*, 385 U.S. 276, 285 (1966). I would concur in a grant of the privilege of voluntary departure, the only relief for which the respondent could be eligible, solely to bring the case, which has been pending far too long, to a conclusion.

## II

Assuming, *arguendo*, the necessity of examining the arrest, the second point of divergence is with respect to the majority finding that an illegal arrest has been established. As the majority notes (Dec. page 4) the facts relating to the challenged "search" were not clearly developed. The evidence as to a claimed illegal arrest consists of the respondent's affidavit in support of her motion to suppress (on advice of counsel she stood largely mute throughout the hearing) and the testimony of a witness to the arrest. Taking this evidence in its most favorable light to the respondent, there is a vagueness in crucial details.

At about 6:00 a.m., when the respondent's husband was preparing to go to work, he was alerted by a telephone call that the Service officers were on their way or were in the neighborhood. This was some 15 minutes before the investigators arrived at the apartment building in which the respondent lived with her husband.[4] We do not know exactly what he was told on the phone, but there is at least a reasonable possibility that the officers were pursuing a specific lead directly to the respondent or her husband or both. This was not developed by either side, beyond ascertaining that the officers did not have a warrant of arrest. Again, the street entrance to the apartment building, according to testimony, was locked. There is evidence that the officers could not have gained entry into the building unless they secured permission of the caretaker on the first floor, and established in some manner their authority to enter. The record is silent in this area.

The respondent's witness, Jose Sandoval, a nephew of the respond-

---

[3] For what it is worth it will be noted that there is testimony the respondent was not held in custody "after she was brought to the office" (Tr. -23). It raises an intriguing question as to just when custody ceased.

[4] At the time of the hearing the husband had departed to Mexico (Tr. 42).

ent's husband, testified that the officers entered the apartment, knocked on the wall *after* entering, and identified themselves. Clearly, if the officers knocked *before* entering, this would be inconsistent with the representations of their entering "quickly without permission or consent." Yet, if their actions were as depicted, why would they knock at all? It is unquestioned that there was in fact a knock, raising at least the likelihood that they may have requested and received permission before entering a crucial area of inquiry if the arrest is to be the turning point of the case. The witness at first (Tr. 56) testified that the door to the respondent's apartment was locked when the immigration officers arrived. Subsequently (Tr. 59), he stated it was *not* locked. Again, this is a crucial point of inquiry.

No substantial offer of proof was made, or evidence submitted, of abusive conduct by the Service officers following the arrest. Those present were questioned as to "legal papers." There was no search of the person. The search, such as it was, was "under the beds and the rooms"—apparently for illegal aliens; nothing was taken from the persons or the premises or from the respondent herself. While these points are not determinative of the nature of the arrest itself, they do tend to negate a picture of a coerced and violent entry and search. All of these considerations, coupled with the obvious possibility for misstatement, confusion, or misunderstanding, create substantial doubts whether the respondent's allegations as to a Fourth Amendment violation can be taken at their face value.

The respondent did ask to call the arresting officer to the stand at the outset of the hearing. No objection was interposed by the Service trial attorney, but the request was denied by the immigration judge as premature (Tr. 26). At the time the request was based solely on the affidavit of the respondent in support of her motion to suppress. She herself at no time testified in support of the affidavit nor did she submit herself to examination respecting the circumstances of the arrest or what took place afterwards. Instead she chose to rely on the testimony of Jose Sandoval. (Tr. 40). Following the testimony of Sandoval, both sides rested on the issue of deportability.[5] The request to subpoena the arresting officer was never renewed, with the result that the record is left in the dubious state in which we now find it.

There was other error below. Either through lack of knowledge of the meaning of 8 C.F.R. 242.17(d), or unwillingness to rely on the somewhat clouded terminology of that regulation, the respondent not only refused to testify with respect to alienage and deportability, but

---

[5] Respondent testified to some extent in support of her application for voluntary departure, although here too, refusing to answer many questions on 5th Amendment grounds.

gave very limited testimony in support of her application for discretionary relief of voluntary departure. In this the immigration judge was at least partly to blame in not advising (Tr. 74), that any admissions made in this connection could not be used against her on the issue of deportability. This Board has since clarified the interpretation of the regulation. An alien may testify freely in support of an application for voluntary departure without fear of adverse affect on the case in chief. *Matter of Bulos,* Interim Decision 2486 (BIA 1976). *See also Matter of Lam,* 14 I&N Dec. 168, 173 (BIA 1972); *Matter of Tsang,* 14 I&N dec. 294, 296 (BIA 1973).

The majority decision has recognized this deficiency in the record and has solved the problem by granting voluntary departure. I would concur in that grant, as a practical matter, for the reasons stated in *I*, above, and to bring the case to a speedy conclusion. However, if the proceeding has to be remanded for other reasons, as is the case if the exclusionary rule issue is to be reached because of a possible Fourth Amendment violation, then the question of her eligibility and worthiness for this relief should also be developed fully in reopened proceedings, particularly since Exhibit 2 shows that this is her second entry. In light of *Matter of Bulos, supra,* respondent is now free to testify without restraint.

These inadequacies of the record are significant if this case is to be a tour de force on the legal issue. It has not been satisfactorily shown that the arrest was illegal. At the same time some groundwork has been laid. The majority ruling on the inapplicability of the exclusionary rule is, at the very least, premature. That issue involves a complex consideration of reach and scope of the Fourth Amendment prohibition against unreasonable search and seizure. It can affect countless cases for years to come. Should this case be made the subject of a petition for judicial review, as it gives every indication it may, a court has the right to know if it needs to reach such an issue, or if the case could be disposed of on other, well established and less controversial principles. Accordingly, again assuming the dubious necessity for meeting the issue, the record should be remanded for full development of the circumstances of the arrest, including the testimony of the arresting officer and of the respondent should she elect to testify. If, on remand, a lawful arrest is proved, the issue can then be met with full knowledge of all of the facts, and an appreciation that it is real rather than hypothesized.[6]

The argument is not convincing that, since the Service has already

---

[6] This also would have the incidental benefit of facilitating evaluation of the quality of the Fourth Amendment violation, if any, in accord with the rule in *Brown v. Illinois, supra.*

expressed its view that the exclusionary rule has no applicability in these cases, a remand would serve no useful purpose. The Service has adopted a similar position as to *Miranda* warnings, yet they are in fact required by regulation, appear in Service forms, and are given, even though not judicially mandated. 8 C.F.R. 287.3; *Navia-Duran v. INS*, 568 F.2d 803 (5 Cir. 1977); *Trias-Hernandez v. INS*, 528 F.2d 366 (9 Cir. 1975). Either for purposes of this case, or for clarification of the record in anticipation of a court challenge, or in defense of Immigration and Naturalization Service actions and those of government officers generally, or having in mind possible criminal prosecution in this and in other cases, or for other reasons not known to this Board, the Service might still prefer to amplify this record. More importantly, a remand is required *for the sake of the respondent.*

If the respondent's legal position should be examined on judicial review, it should not meet with a rebuff solely as a result of her not having an opportunity to present significant evidence.

### III

Lastly, since this case may well reach the courts in its present posture, it is necessary to state a position on the applicability of the exclusionary rule in deportation proceedings.

It is difficult to quarrel with substantial portions of the majority decision. The applicability of the exclusionary rule in civil proceedings, generally, does appear to be a viable issue. *Weeks v. U.S.*, 232 U.S. 383 (1914); *Wong Sun v. U.S.*, 371 U.S. 471 (1963); *U.S. v. Janis*, 428 U.S. 433 (1976); *cf.* Concurring Opinion Chairman Roberts, *Matter of Yau*, 14 I&N Dec. 630, 637 (BIA 1974). Concededly too, it has now been established that the deterrent effect of the rule underlies its purpose and usefulness. *U.S. v. Calandra*, 414 U.S. 338 (1974); *United States v. Janis*, *supra.*

Some impatience with the application of the exclusionary rule in deportation proceedings, is also understandable. In case after case, this Board has been confronted with a mute alien and a claim that evidence is tainted by a Fourth Amendment violation and hence should be excluded. Unlike the instant case, frequently no foundation whatsoever has been laid for such a claim. As Board Member Farb noted in his separate concurring opinion, the claims are often advanced in that large body of cases involving claimed recent entrants without inspection, as to whom there usually exist no Service records and little besides the aliens' own admissions to establish alienage and deportability. In many such cases no affirmative defense to deportability is offered, no offer of proof of improper Service action is advanced, at least in correct or substantial form, and a loud outcry is made for

production of the arresting officer, whether his testimony is shown to be necessary or not, presumably so that the respondent may lose himself, the Service, and this Board, in the thickets of obfuscation and delay thus created.

To the extent that this sort of irresponsible challenge is a by-product of holding the exclusionary rule applicable in deportation cases, the majority decision is correct. However, that a challenge may be mounted irresponsibly, in itself does not justify rejection of the rule as a matter of law. Rather, each claim must be met on a case-to-case basis with patience and firmness, and with due regard to the merits of the given case. The exclusionary rule protects the long time lawful permanent resident just as much as the recent entrant without inspection. In any event, it is doubtful that elimination of the exclusionary rule will cure these claims. Challenges to the admissibility of evidence can always be counted on allegations of duress, coercion, and lack of due process. 8 C.F.R. 287.3 bears indigenous seeds for motions to suppress for failure to follow correct arrest procedures. As long as this regulation remains in the books—and the Service, thankfully, has shown no inclination towards removing it—there is always the possibility of a frivolous and purely dilatory challenge to the admissibility of evidence.

However, the majority decision glosses over, much too lightly, one very serious, and perhaps determinative, consideration. It is too late in the game for a change of Service or Board position regarding the applicability of the exclusionary rule. The fact is that the Immigration and Naturalization Service has accepted and applied the rule, as has this Board, for many years and in countless cases since the dictum in *U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 155 (1923) that "evidence obtained * * * through an illegal search and seizure cannot be made the basis of a finding in deportation proceedings." As the majority notes, the Board has often pointed to untainted evidence in cases involving this issue, as the basis for its decision, and has refused to rely on evidence which might be flawed by a Fourth Amendment violation. *See, for example, Matter of Cheung*, 13 I&N Dec. 794, 796 (BIA 1971); *Matter of Wong*, 13 I&N Dec. 820, 822 (BIA 1971); *Matter of Hemblen*, 14 I&N Dec. 739 (BIA 1974). The published decisions are replete with discussion of the admissibility of evidence challenged on the ground of illegal arrest and search—discussion which would be surplusage if the Board were not applying and following the exclusionary rule. It is totally irrelevant that the rule has been followed and applied, sometimes expressly, and sometimes by implication. The rule has been followed. There is no question whatsoever that this is the case.[7]

---

[7] A partial list of relevant administrative and judicial decisions is set forth in the

The rule having been accepted and followed for so many years, the natural inquiry is—what reason is there for a change now? The majority decision fails to answer this satisfactorily. The Service has advanced no argument for a change beyond mere reliance on the civil nature of deportation proceedings, and advice that, according to a memorandum of the Associate Attorney General, the Department of Justice is adopting, generally, the rule which the Service is now urging upon us. We, of course, are not bound by the enunciation of position of the Associate Attorney General. *See U.S. ex rel Accardi v. Shaughnessy,* 347 U.S. 260 (98 L.Ed. 681, 74 S.Ct. 499).

Despite the strident debate by legal scholars over its efficacy, the exclusionary rule remains the law of the land. To date, nothing in the precedents has limited its application to criminal cases. On the contrary, its application to some civil proceedings has been recognized in the federal courts. *See, for example, Pizzarello v. U.S.,* 408 F.2d 579 (2 Cir. 1969), *cert. denied,* 396 U.S. 986 (1969)—civil assessment of wagering taxes; *Knoll Associate Inc. v. Federal Trade Commission,* 397 F.2d 530 (7 Cir. 1968)—use of stolen documents by Federal Trade Commission barred in civil action; *Powell v. Zuckert,* 366 F.2d 634 (D.C. Cir. 1966)— review of plaintiff's discharge from the Air Force; *One 1958 Plymouth Sedan v. Commonwealth of Pa.,* 380 U.S. 693 (1965)—civil proceeding by the state for the forfeiture on an automobile; *Rogers v. U.S.,* 97 F.2d 691 (1 Cir. 1938)—civil action to recover customs duties on imported liquors; *U.S. v. Blank,* 261 F.Supp. 180 (N.D. Ohio 1966)—civil tax assessment; *Lassoff v. Gray,* 207 F.Supp. 843 (W.D. Kentucky 1962)— civil liability for wagering taxes and assessment. *See also U.S. v. Janis, supra,* at 455, 456 and cases there cited. There is also judicial recognition of its use in deportation proceedings, *Ex parte Jackson,* 263 F.110 (DC Mont. 1920), appeal dismissed 267 F.1022 (9 Cir. 1920); *Schenck ex rel Chow Fook Hong v. Ward,* 24 F.Supp. 776 (DC Mass 1938); *Wong Chung Che v. INS,* 565 F.2d 166 (1 Cir. 1977); (and see also court cases cited in APPENDIX).

The rationale of these cases is well expressed in *U.S. v. Blank, supra,* "Where as here there is a correlative civil action open to the Government which imposes a penalty * * * commensurate with the criminal sanctions to which as accused, victimized by an illegal search would be exposed, then we see no distinguishable difference between the two forms of punishment which excuses the government from complying

---

APPENDIX. As is to be expected, the growth in the sophistication of the challenges is compatible with that of the judicial rulings. While the references to the Fourth Amendment, "tainted evidence," "fruit of the poisoned tree, the exclusionary rule," and formal Motion to Suppress, appear, as such, primarily in the later decisions, the basic underlying challenge to the admissibility of evidence is the same in all of the cited cases, namely, that it was procured by a Fourth Amendment violation.

with constitutional mandates when prosecuting their action in a civil forum." *Id*, at 182. While the applicability of the rule in *all* civil proceedings would be highly questionable—and in fact has been rejected, *U.S.* v. *Frederickson*, 581 F.2d 711 (8 Cir. 1978); *U.S. ex rel Sperling* v. *Fitzpatrick*, 426 F.2d 1161 (2 Cir. 1970), absent special considerations it would seem that a nexus to a criminal sanction should reasonably dictate its use. *One 1958 Plymouth Sedan* v. *Commonwealth of Pa.*, *supra.*

It will be noted that all of the foregoing cases involved *intrasovereign* violations, a careful distinction drawn in *Janis*, *supra*. Their precedent force, therefore, is in no way impeached by *Janis*, a decision based on the blunting of the deterrent effect of the rule by the lack of interaction between the federal criminal proceeding, and a state civil proceeding. *Janis*, on the other hand, does emphasize the significance of the proximity of the deterred action to the result sought to be achieved.

We are concerned here with one Governmental agency and the enforcement of a statute narrowly restricted to aliens. The evidence supporting the civil deportation case is frequently the same as that which may support a criminal proceeding against the same person. *See*, for example, Section 275 I&N Act, 8 U.S.C. 1325 (Illegal Entry). The same arresting officer initiates both proceedings and precipitates either or both of the results—*i.e.*, civil or criminal. Even with full awareness of the many cases rejecting, in a civil deportation proceeding, the constitutional safeguards applicable generally to criminal proceedings, one cannot ignore the severe consequences of deportation in some cases, and its analogy to a criminal sanction (*Fong Haw Tan* v. *Phelan*, 333 U.S. 6, 10). Despite the circumscription of such rulings as *Almeida-Sanchez* v. *INS*, 413 U.S. 266 (1973); *Brignoni-Ponce*, 422 U.S. 873 (1975); and *U.S.* v. *Martinez-Fuerte*, 514 F.2d 308 (9 Cir. 1975), Immigration and Naturalization Service officers have wide latitude to arrest without warrant, both in anticipation of criminal proceedings, and/or as a precursor to the civil deportation proceedings (Section 287, Section 235, I&N Act, 8 U.S.C. 1357 and 1225).

In essence, civil and criminal proceedings walk hand in hand in intrasovereign wedlock. We have, therefore, the two requisites for use of the rule in civil proceedings: 1) an intrasovereign relationship, and 2) a correlative criminal sanction. Under the majority position, the government may have a criminal action against an alien for violation of section 275 (8 U.S.C. 1325) thrown out because of fatally contaminated evidence, and then turn right around and proceed against him in a deportation proceeding of equal or greater consequence, relying on the identical evidence. This is wrong. *U.S.* v. *Blank*; *One 1958 Plymouth Sedan* v. *Commonwealth of Pa.*, *supra.*

95

Underlying the majority decision is the premise that there is something inherent in a civil deportation proceeding, as against a criminal proceeding, which makes the application of the rule (a) less necessary, and (b) less effective. Neither of these assumptions is acceptable.

There is inconsistency in the majority reasoning that since the exclusionary rule will continue to deter misconduct because criminal proceedings may flow from the deportation "arrest," therefore it is not necessary to apply the rule to the civil proceedings flowing from that arrest. The deportation itself, in some cases, civil or not, is a far more serious consequence than the brief imprisonment or negligible fine customarily meted out for criminal immigration violations, by the courts. If necessary and effective as a deterrent flowing from inability to establish the criminal case, it is at least just as necessary as to the civil one.

The Fourth Amendment guards the right of the "people" to the security of their homes, property and persons. It is not limited in its language either, as to criminal cases or as to citizens.[8] The exclusionary rule, in turn, links the power to search and seize with the use of incriminatory evidence. Its purpose is to insure that an abuse of one takes the profit out of the acquisition of the other. It prevents the violation by penalizing the violator. Aborting the consequences of a violation is only an incidental result, or, better stated, a means to the primary end of curbing Fourth Amendment violations.

So long as an abuse of a power to invade privacy and arrest and search, might be an integral part of the gathering of incriminatory evidence for use in either a civil or criminal proceeding, as is possible in deportation cases, it would seem to make little difference, so far as the violation is concerned, if the end result is the use of the evidence in a civil, or criminal, proceeding, or both. If anything, looking to the need for the rule, it would seem to follow that the less significant the objective sought to be obtained by the breach of the constitutional imperative, the more reprehensible and needful of restraint or deterrence, is the violation. Certainly nothing in the inherent nature of a civil deportation proceeding, even assuming it has less "importance" than a criminal case, supports the conclusion the rule is less necessary. Indeed, given the possible lack of education of the alien, frequent language difficulties, and unfamiliarity with either the law or his rights in a strange country, the opposite would seem to be the case.

---

[8] "For the inalienable rights of personal security and safety, orderly and due process of law, are the fundamentals of social compact, the basis of organized society, the essence and justification of government, the foundation, key, and capstones of the Constitution. They are limited to no man, race, or nation, to no time, place, or occasion, but belong to man, always, everywhere, and in all circumstance. Every nation demands them for its people from all other nations." *Ex parte Jackson*, 263 F.110, 113.

To evaluate the *effectiveness* of the rule when applied to deportation proceedings, it is necessary to appreciate its rationale. The exclusionary rule is premised on the assumption that the likelihood of aborting a prosecution is a sufficiently significant loss to an officer, to deter him from violations in the future. The majority, in effect then, is saying that the civil deportation proceeding is not sufficiently significant, as compared with a criminal proceeding based on the same facts, to bring the deterrent effect of the rule into play.

This too does not withstand examination. On the contrary, if the evidence is barred in the civil deportation proceedings, the consequences are grave enough that the deterrent effect is equivalent to that in a criminal proceeding stemming from the same breach of the law. As for the officer, one possible result of his violation could be, as the majority notes, that the illegal alien may be forever in a non-deportable status. At the very least, new proceedings, wasteful of manpower and money, and uncertain in result, might have to be begun. This should certainly deter a conscientious Service officer from the violation. The conclusion is inevitable that the rationale of the exclusionary rule compels its application to this proceeding.

That there is a paucity of cases terminated because of Fourth Amendment violations, is the soundest proof that the Service has been able to live more than adequately with the rule and that, as the majority noted (Dec. 13), the "societal costs" of the application of the rule have been minimal. Indeed, if one is to look to consequences (admittedly a questionable basis for decision making), there is probably no better way to facilitate confusion and delay in these cases than through the litigious weapon the majority has now forged. Where hitherto the Board has patiently examined each of these claims of Fourth Amendment violations, their summary rejection as a matter of law, can only spawn repeated, unexamined, unrebutted, and, undoubtedly, lurid, claims of abuse.

In the past the Board has demanded an acceptable, nonfrivolous offer of proof as a minimum. *Matter of Geronimo*, 13 I&N Dec. 680 (BIA 1971); *Matter of Tang*, 13 I&N Dec. 691 (BIA 1971); *U.S.* v. *Garcia*, 272 F.Supp. 286 (S.D.N.Y. 1967); *Matter of Godfrey*, 13 I&N Dec. 790 (BIA 1971); *Matter of Wong*, 13 I&N Dec. 820 (BIA 1971). It has relied only on clearly untainted evidence. If an immigration judge failed in this regard, or misunderstood the position of this Board, the questioned evidence was either given no weight, rejected outright, or the case was returned so that the record might be clarified as to just what had occurred and whether the evidence was tainted or not. *See,* for example, *Matter of Cheung* and *Matter of Wong, supra.* In at least one instance where the Board failed to clearly set forth its reasons for accepting apparently questionable evidence, it was quickly called to

account. *Wong Chung Che* v. *INS*, 565 F.2d 166 (1 Cir. 1977). With this screening, the rule has worked, and the frivolous claim has been sifted out, generally without too much trouble. On the other hand, the occasional nonfrivolous claim, supported by hard facts, has received the attention that it deserves.

In summary, the long standing practice of the Board has been to recognize and apply the exclusionary rule. This has been satisfactory up to this point, due in part to a screening process which weeds out frivolous and irresponsible claims, yet permits scrutiny of substantial challenges. No adequate reason for a change in the Board's position has been put forth. There is judicial support for the use of exclusionary rule in civil proceedings, including deportation proceedings. Precedents dictate its use in civil proceedings involving (1) an intrasovereign relationship and (2) a correlative criminal proceeding. Deportation is such a proceeding. The reason for the existence of the rule dictates its application here, both in the *need* for the rule and its possible *effectiveness* as a deterrent. Lastly, experience has shown an absence of serious societal costs in the use of the rule in deportation proceedings.

For all of the above reasons I am unable to concur in that portion of the majority decision which holds that the exclusionary rule is inapplicable in civil deportation proceedings.[*]

Solely for the reasons set forth under Part I of this separate decision, I would find the alien deportable, and would grant voluntary departure within 30 days from the date of this order or such further extension as might be granted by the District Director.

*APPENDIX*

*Matter of B—R—*, I&N Dec. 760 (BIA 1952); *Matter of D—M—*, 6 I&N Dec. 726, 729 (BIA 1955); *Matter of R—S—*, 7 I&N Dec. 271 (A.G. 1956); *Matter of T—*, 9 I&N Dec. 646, 647 (BIA 1962); *Matter of Pang*, 11 I&N Dec. 213 (BIA 1965), aff'd sub nom.; *Ah Chiu Pang* v. *INS*, 368 F.2d 637 (8 Cir. 1966), *cert. denied*, 386 U.S. 1037; *Matter of Chen*, 12 I&N Dec. 603 (BIA 1968); *Matter of Yam*, 12 I&N Dec. 676 (BIA 1968), aff'd, *Yam Sang Kwai* v. *INS*, 411 F.2d 683 (D.C. Cir. 1969), *cert. denied*, 396 U.S. 877; *Matter of Doo*, 13 I&N Dec. 30 (BIA 1968); *Matter of Methure*, 13 I&N Dec. 522 (BIA 1970); *Matter of Lane*, 13 I&N Dec. 632 (BIA 1970);

---

[*] There may be alternatives (Dec. P.14ff). They may or may not be effective. Clearly, their existence does not compel rejection of the present remedy. Employee complaints to the Service might seem of questionable effectiveness; and the parameters of *Bivens* v. *Six Unknown Narcotics Agents*, 403 U.S. 388 (1971), and not yet fully known.

*Matter of Yau*, 14 I&N Dec. 630 (BIA 1974); *Matter of Scavo*, 14 I&N Dec. 326 (BIA 1973); *Matter of Tsang*, 14 I&N Dec. 294 (BIA 1973); *Matter of Wong*, 13 I&N Dec. 820 (BIA 1971); *Matter of Tang*, 13 I&N Dec. 691 (BIA 1971); *Matter of Au, Yim, and Lam*, 13 I&N Dec. 294 (BIA 1969); aff'd, *Au Yi Lau v. INS*, 445 F.2d 217 (D.C. Cir. 1971), *cert. denied*, 404 U.S. 864; *Matter of Burgos and Burgos-Godoy*, Interim Decision 2375 (BIA 1975); *Matter of Chen*, Interim Decision 2440 (BIA 1975), aff'd *Nai Cheng Chen v. INS*, 537 F.2d 566 (1 Cir. 1976); *Matter of Rojas*, Interim Decision 2444 (BIA 1975); *Matter of Bulos*, Interim Decision 2486 (BIA 1976); *Matter of Rojas*, Interim Decision 2510 (BIA 1976); *Matter of Davila*, Interim Decision 2521 (BIA 1976); *Matter of Mejia*, Interim Decision 2527 (BIA 1976); *Matter of Gonzalez*, Interim Decision 2536 (BIA 1976); *Matter of Escobar*, Interim Decision 2538 (BIA 1976); *Matter of Castro*, Interim Decision 2547 (BIA 1976); *Matter of Baltazar*, Interim Decision 2556 (BIA 1977); *Matter of Cachiguango and Torres*, Interim Decision 2582 (BIA 1977); *Matter of Taerghodsi*, Interim Decision 2596 (BIA 1977); *Matter of King and Yang*, Interim Decision 2647 (BIA 1978).

See also *Klissas v. INS*, 361 F.2d 529 (D.C. Cir. 1966); *Vlissidis v. Anadell*, 262 F.2d 398 (7 Cir. 1959); *Ho Chong Tsao v. INS*, 538 F.2d 667 (5 Cir. 1976); *Aguirre v. INS*, 553 F.2d 501 (5 Cir. 1977); *Cordon de Ruano v. INS*, 554 F.2d 944 (9 Cir. 1977); *Hoonsilapa v. INS*, 575 F.2d 735 (9 Cir. 1978); *Cheung Tin Wong v. INS*, 468 F.2d 1123 (D.C. Cir. 1972); *Shu Fuk Cheung v. INS*, 476 F.2d 1180 (8 Cir. 1973); *Huerta-Cabrera v. INS*, 466 F.2d 759 (7 Cir. 1972); *Ojeda-Vinales v. INS*, 523 F.2d 286, 287-288 (2 Cir. 1975); *Illinois Migrant Council v. Pilliod*, 548 F.2d 715 (7 Cir. 1977); modifying, 540 F.2d 1062 (7 Cir. 1976); *Marquez v. Kiley*, 436 F.Supp. 100 (S.D.N.Y. 1977); *Shan Gan Lee v. INS*, 590 F.2d 497 (3 Cir. 1979).